# Commonwealth v. Young

C.P. of Lehigh County, no. CR-3724-2009.

*Steven Luksa, first assistant district attorney,* for Commonwealth.
*Karen Schular,* for defendant.

STEINBERG, *J.,* August 30, 2010—The defendant, Jasmin Young, is charged with attempted criminal homicide[1] (2 counts), attempted assault of a law enforcement officer[2] (2 counts), aggravated assault[3] (8 counts), possession of firearm with altered manufacturer's number,[4] persons not to possess, use, manufacture control, sell or transfer firearms,[5] and firearms not to be carried without a license.[6] The defendant, after disregarding commands to show his hands by members of the Allentown Police Department, pointed a small black revolver in the direction of Officer Alex De La Iglesia and Officer David Howells III. Both officers heard "distinct hammer strikes,"[7] and then fired their service revolvers, striking the defendant. The firearm the officers observed, a Rossi five-shot revolver, was recovered, and "five spent casings" were in the cylinder of the weapon.[8]

Omnibus pretrial motions were filed on behalf of the defendant, which are divided into seven sections A—G: (A) "motion for remand for a new preliminary hearing," (B) "motion for writ of habeas corpus" pertaining to the charges of attempted criminal homicide, aggravated assault and attempted assault of a law enforcement officer; (C) "motion challenging the constitutionality of

1. 18 Pa.C.S. §2501(a).

2. 18 Pa.C.S. §2702.1(a).

3. 18 Pa.C.S. §2702(a)(1) (two counts); §2702(a)(2) (two counts); §2702(a)(4) (two counts); §2702(a)(6) (two counts).

4. 18 Pa.C.S. §6110.2.

5. 18 Pa.C.S. §6105(a)(1).

6. 18 Pa.C.S. §6106(a)(1).

7. Notes of Testimony, "Omnibus pretrial motions pursuant to Pennsylvania Rule of Criminal Procedure 578," 2/24/10 (N.T.P.T.M.), pp. 35, 59, 78-79.

8. N.T.P.T.M. 2/24/10, pp. 134-35.

assault of law enforcement officer," (D) "motion to suppress statements allegedly made at Lehigh Valley Hospital Center," (E) "motion to suppress identification of defendant," (F) "motion to compel discovery," (G) "motion to suppress statement due to unreasonable delay between arrest and preliminary arraignment." Hearings on these motions were held on February 24, 2010 and June 29, 2010. During the hearing held on February 24, 2010, the motion to compel discovery was dismissed without prejudice. Counsel for the defendant indicated that discovery had been exchanged with the exception of internal police investigative materials pertaining to the shooting.[9] On April 1, 2010, an order was entered requiring the Commonwealth to release internal police documents, including the statements of Officer Howells III and Officer De La Iglesia that pertain to this incident.

It was agreed at the hearing in this matter that this court would evaluate the sufficiency of the evidence, and so the motion to remand this matter for a preliminary hearing was withdrawn. *Commonwealth v. Allen,* 367 Pa. Super. 173, 183, 532 A.2d 845, 850 (1987) (judges of the court of common pleas have concurrent jurisdiction as issuing authorities with [magisterial district judges] within their jurisdiction). The Commonwealth presented the following witnesses at the hearings in this matter: (1) Officer David Howells III; (2) Officer Alex De La Iglesia; (3) Officer Kyle Pammer; (4) Detective Louis Collins; (5) Detective Michael Milian; (6) Detective William Lake; and (7) Detective Lou Tallerico. The defendant presented the testimony of: (1) Officer Edward Zucal; (2) Attorney Eric Dowdle; (3) Joseph Perez; and (4) Lisa

9. N.T.P.T.M. 2/24/10, pp. 6-8.

Worman, a registered nurse at Lehigh Valley Hospital, Cedar Crest. Various exhibits were also introduced into evidence at the hearings: (1) a photograph of the defendant's red sweatshirt;[10] (2) a photograph of the firearm that was secured from the scene;[11] (3) a photographic array, which included the defendant's photograph;[12] (4) a ballistics laboratory report;[13] (5) *Miranda* rights waiver form;[14] (6) tape of attempted interview with the defendant on 4/23/09;[15] and (7) medical records of the defendant.[16] The parties also stipulated that the defendant was not licensed to carry a firearm or even possess a firearm.[17]

The testimony at the hearings revealed that on April 18, 2009, shortly before 2 a.m., officers were dispatched to the vicinity of the Hotel Grand at 10th and Linden Streets for a report of "shots fired and somebody lying down in the middle of the street."[18] Officers Howells and De La Iglesia arrived within seconds. Officer De La Iglesia observed a man, later determined to be Mr. Perez, standing in the doorway of the Hotel Grand holding a "silver semi-automatic handgun." [19] Once Officer De La Iglesia was satisfied that Mr. Perez was actually conducting security at the Hotel Grand, and was not a threat, Mr. Perez told the officers that someone had shot at him.[20]

---

10. Commonwealth's exhibit 1.
11. Commonwealth's exhibit 2.
12. Commonwealth's exhibit 3.
13. Commonwealth's exhibit 4.
14. Commonwealth's exhibit 5.
15. Defendant's exhibit 1.
16. Defendant's exhibits 2 and 3.
17. N.T.P.T.M. 2/24/10, p. 142.
18. N.T.P.T.M. 2/24/10, pp. 20, 67.
19. N.T.P.T.M. 2/24/10, p. 69.
20. N.T.P.T.M. 2/24/10, pp. 71-72.

He provided the officers with a description of the shooter as a "black male wearing a red hat, a red sweatshirt with . . . graffiti on the back or writing and dark jeans."[21] While Officer De La Iglesia was acquiring that information, Officer Howells radioed that he observed an individual matching that description in a parking lot to the rear of the Hotel Grand.[22] Officer De La Iglesia then ran to assist Officer Howells.

Officer Howells observed a large group of individuals on Plum Street, which is a small street immediately west of 10th Street, one of whom was wearing red. He drove his patrol vehicle down Plum Street, and as he did so, most of the individuals dispersed, but not the defendant. Officer Howells was also receiving radio communication that the individual who was involved in the shooting had a red shirt with some type of lettering or graffiti.[23] The defendant's clothing matched the description of the person who was described by Mr. Perez.[24] At some point, Officer Howell's exited his vehicle and began to follow the defendant, who was now by himself. They both entered the parking lot behind the Parking Authority, which is a building on the northwest corner of 10th and Hamilton Streets. The defendant continued walking toward Hamilton Street, never turning around, when Officer Howells and Officer De La Iglesia, who had now arrived, ordered the defendant to stop and show his hands.[25] The defendant ignored their commands, and Officer Howells observed a gun from underneath the defendant's left

21. N.T.P.T.M. 2/24/10, p. 70.
22. *Id.*
23. N.T.P.T.M. 2/24/10, pp. 26-27.
24. N.T.P.T.M. 2/24/10, pp. 27, 46.
25. N.T.P.T.M. 2/24/10, pp. 30-31.

armpit. "I saw the barrel and I saw a chamber, it was a small black revolver . . . I saw him going with the gun . . . pointing right at Officer [De La] Iglesia, and then the barrel."[26] "I knew exactly it was a revolver and then when the whole gun appeared then he pivoted his whole back and then that's when the gun . . . [was] pointed directly at me."[27] "Then right away I heard click-click. I knew he was manipulating the trigger. And through my experience . . . that if for some reason one round didn't go off, or it was a dead round or something, all you have to do is pull the trigger again and have another live round go."[28] The defendant was approximately 12 yards away from Officer Howells when he heard the manipulation of the trigger.[29] Officer Howells yelled "gun" and fired his weapon two times.[30] The defendant, after the second round was fired by Officer Howells, fell face down to the ground. The firearm the defendant pointed was then observed a few feet over the defendant's left shoulder, and was secured by Officer Kyle Pammer by placing it in the locked trunk of Officer Skriletz.[31]

Officer De La Iglesia's version of events was similar to Officer Howells. When he reached Officer Howells, he observed the defendant enter the Allentown Parking Authority's parking lot. He, like Officer Howells, identified himself as a police officer and ordered the defendant to stop, which the defendant disregarded. Moments later, Officer De La Iglesia, who was 10-15 yards away from

---

26. N.T.P.T.M. 2/24/10, pp. 31-32, 36-37, 60.
27. N.T.P.T.M. 2/24/10, p. 35.
28. N.T.P.T.M. 2/24/10, p. 35
29. N.T.P.T.M. 2/24/10, p. 48.
30. N.T.P.T.M. 2/24/10, pp. 38-39, 60.
31. N.T.P.T.M. 2/24/10, pp. 104-106, 111.

the defendant, saw a black object, heard "distinct hammer strikes . . . either two or three," and then saw "a black small revolver, a snub-nose revolver . . . pointed pretty much on my chest."[32] "So I leveled off my sites on his body and I discharged one round in his direction."[33] Officer De La Iglesia heard Officer Howells' gun discharge twice.

Detective Sergeant William Lake responded to the scene shortly after it occurred. He learned that the gun was in the trunk of a police vehicle and gained access to it. The firearm was a Rossi five-shot revolver, with the serial number removed, and five spent shell casings in the cylinder of the weapon.[34] Bullet fragments were also recovered in the area of 10th and Linden Streets, including one fragment which was located on the opposite side of the street from the Hotel Grand. The fragment was discharged from the Rossi revolver.

The defendant was transported to Lehigh Valley Hospital for his gunshot wound and remained hospitalized until April 29, 2009. During his recovery at the hospital, he was arraigned by Magisterial District Judge Merlo on April 23, 2009. Detective Michael Millan and Detective Lake also attempted to interview the defendant on April 23, 2009. They did not go earlier because of the defendant's medical condition. They attempted to interview the defendant in the morning, but ended their conversation with the defendant after 10 minutes because the defendant said he was very tired. They returned that afternoon at approximately 2:30 p.m. with Assistant

32. N.T.P.T.M. 2/24/10, pp. 78-80, 87.

33. N.T.P.T.M. 2/24/10, p. 79.

34. N T.P.T.M. 2/24/10, pp. 134-35.

Chief Ronald Manescu and Magisterial District Judge Merlo. The defendant's "energy level" was markedly improved from earlier that day, and there was no difficulty in conducting the arraignment.

Following the departure of Magisterial District Judge Merlo, Detective Lake began speaking with the defendant. The defendant agreed to speak with the detectives, but did not want to speak on tape. Detective Millan described the defendant as "open, talking, and cooperative to conversation." Detective Lake began by asking the defendant some biographical information, and then advised him of his *Miranda* rights. The defendant was then interviewed, primarily by Detective Millan.[35]

The entire interview with the defendant lasted approximately 30 minutes. During the interview the defendant told the detectives that he did not remember what happened. He did disclose that he possessed a gun, a .38 special, which he had acquired in Philadelphia three years earlier. He said he possessed it for protection. He was unable, however, to provide the name of the individual from whom he received the weapon. The defendant's recollection of the evening of the shooting was limited to engaging in an argument at Phillies Bar, and that he was "real drunk."

Following the interview, Detective Millan asked the defendant if he would permit the officers to return and speak again in the future. The defendant agreed, and received Detective Millan's business card. Throughout the interview process, the detectives described the de-

---

35. Counsel agreed to permit this court to review the questions and answers of the defendant's interview.

fendant as coherent and capable of accurately providing background information. He responded in sentences, not one word answers.

The defense witnesses characterized the defendant's responsiveness in a similar fashion. Officer Zucal, who was assigned to guard the defendant at the hospital, testified that on the date of the defendant's arraignment, the defendant was more alert in the afternoon. While the defendant began to "nod-off" in the presence of the detectives, it was only towards the end of the interview with Detective Millan. Ms. Worman testified that on April 23, 2009, that the defendant's condition had sufficiently improved to the point that he was ready to be transitioned out of the Trauma Unit once a clean bed was available. She also reviewed the prescribed medication the defendant received on April 23, 2009, and it was her opinion that it had worn off by the time of his arraignment.

## DISCUSSION

### I. *Motions for Writ of Habeas Corpus*

The defendant's challenge to the evidence alleges that the Commonwealth failed to establish a prima facie case on the charges of attempted criminal homicide, aggravated assault and attempted assault of a law enforcement officer. Most of the defendant's contentions revolve around the five spent casings found in the cylinder of the Rossi five-shot revolver.

The Commonwealth, at this stage of the proceedings, is not required to prove the defendant's guilt beyond a reasonable doubt. *Commonwealth v. Saunders,* 456 Pa. Super. 741, 746, 691 A.2d 946, 948 (1997), *appeal denied,*

550 Pa. 703, 705 A.2d 1307 (1997). Instead, a prima facie ease is necessary which has been explained as follows:

"A prima facie case consists of evidence, read in the light most favorable to the Commonwealth, that sufficiently establishes both the commission of a crime and that the accused is probably the perpetrator of that crime. The Commonwealth need not prove the defendant's guilt beyond a reasonable doubt. Rather, the Commonwealth must show sufficient probable cause that the defendant committed the offense, and the evidence should be such that if presented at trial, and accepted as true, the judge would be warranted in allowing the case to go to the jury. *Commonwealth v. Fountain,* 811 A.2d 24, 25-26 (Pa. Super. 2002). (quotations, quotation marks, and citation omitted) 'In determining the presence or absence of a prima facie case, inferences reasonably drawn from the evidence of record that would support a verdict of guilty are to be given effect, but suspicion and conjecture are not evidence and are unacceptable as such.' *Commonwealth v. Packard,* 767 A.2d 1068, 1071 (Pa. Super. 2001). (citation omitted)" *Commonwealth v. Keller,* 823 A.2d 1004, 1010-1011 (Pa. Super. 2003); see also, *Commonwealth v. Santos,* 583 Pa. 96, 101, 876 A.2d 360, 363 (2005).

## A. Attempted Homicide

The Crimes Code provides that "[a] person commits an attempt when with the intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime."[36] "A person may

---

36. 18 Pa.C.S. §901(a).

be convicted of attempted murder 'if he takes a substantial step toward the commission of a killing with the specific intent in mind to commit such an act.' . . . The substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts remaining to be done before the actual commission of the crime." *Commonwealth v. Jackson,* 955 A.2d 441, 444 (Pa. Super. 2008). (internal citations and quotations omitted)

The intent to kill can be proven by direct or circumstantial evidence. It may also be inferred from acts or conduct or from the attendant circumstances. *Commonwealth v. Holley,* 945 A.2d 241, 247 (Pa. Super. 2008), guoting from *Commonwealth v. Lewis,* 911 A.2d 558, 564 (Pa. Super. 2006). In *Jackson,* officers were investigating a shooting incident when a gun battle erupted as they were interviewing a witness. Detectives and officers pursued the gunmen and when they rounded the corner, the defendant "raised his gun toward the detective." *Jackson* at 444-45. In response, one of the detectives fired at the defendant. The court, in finding the evidence sufficient to support the defendant's conviction for attempted murder, found that moments prior to raising his arm with the gun, the defendant was firing it at another individual. The substantial step test did not require that the defendant take "aim and fired the gun at the detective. Under the substantial step test . . . our focus is on the acts appellant completed not on the acts that remained for the actual commission of [the detectives'] murder." *Id.* at 445.

Here, Officers Howells and De La Iglesia responded to a dispatch of shots fired. The dispatch information was

confirmed when they arrived at the Hotel Grand. They were also provided a description of the shooter, which matched the defendant. Their investigation into the shooting led them, moments later, to the defendant. Their instructions to stop were ignored by the defendant, and, instead, a revolver appeared underneath the defendant's left armpit area. The revolver was pointed directly at Officer De La Iglesia's chest. If any doubt existed at that moment about the defendant's intentions, it was removed when Officers Howells and De La Iglesia heard the distinct hammer strikes. The defendant was taking a substantial step toward killing them.

The defendant's ignorance concerning the number of rounds he discharged earlier does not negate his intent. He engaged in the purposeful action of pulling the trigger in an attempt to fire the revolver. The five spent shell casings may have thwarted the defendant's ability to kill the officers, but the distinct hammer strikes demonstrate his intended goal.

The Crimes Code has also abolished the defenses of factual and legal impossibility to attempt crimes.[37] See *Commonwealth v. Henley,* 504 Pa. 408, 474 A.2d 1115 (1984). Therefore, the defendant's misapprehension concerning the rounds capable of discharge from the firearm does not provide him with a defense. It is also apparent from the defendant's statements that he did not possess the weapon as a curio, but for use to protect himself from any perceived threat. See *Commonwealth*

---

37. 18 Pa.C.S. §901(b). "Impossibility.—It shall not be a defense to a charge of attempt that because a misapprehension of the circumstances it would have been impossible for the accused to commit the crime attempted."

*v. Lopez,* 439 Pa. Super. 625, 632, 654 A.2d 1150, 1154 (1995) (collecting cases) (The intent to commit a crime coupled with the preparation of all acts necessary to perform the crime constitutes criminal liability despite the fact that it is impossible to complete the crime); *Commonwealth v. Chance,* 312 Pa. Super. 435, 443, 458 A.2d 1371, 1374-75 (1983) (pointing unloaded gun at victim which victim heard clicks several times sufficient to support conviction).

Various other courts have upheld convictions for attempted murder where an accused, believing a gun was loaded, pulled the trigger, but the gun was either unloaded or misfired. In *Commonwealth v. Damms,* 100 N.W.2d 592 (Wis. 2d 1960) (collecting cases), the defendant pointed a pistol, which he believed to be loaded, at the head of his wife and pulled the trigger. Nothing happened, which caused the defendant to exclaim, "It won't fire. It won't fire." The Supreme Court of Wisconsin, in rejecting the defendant's impossibility defense, stated the following:

"Sound public policy would seem to support the majority view that impossibility not apparent to the actor should not absolve him from the offense of attempt to commit the crime he intended. An unequivocal act accompanied by intent should be sufficient to constitute a criminal attempt. Insofar as the actor knows, he has done everything necessary to insure the commission of the crime intended, and he should not escape punishment because of the fortuitous circumstance that by reason of some fact unknown to him it was impossible to effectuate the intended result." *Id.* at 596.

See also, *Ross v. Felker,* 669 F. Supp.2d 1135 (C.D. Cal. 2009) (defendant pointed gun at victim and pulled the trigger, but the gun did not discharge); *Leslie v. Artuz,* 72 F. Supp.2d 267 (S.D.N.Y. 1999) (defendant pointed loaded gun at police officer, officer heard a metallic click, the recovered gun contained a cartridge in the firing chamber, but the gun was damaged and did not fire); *State v. Sharp,* 661 A.2d 1297 (N.J. Super 1995) (defendant pointed gun at two police officers and pulled the trigger, but the gun did not fire); *Dover v. State,* 570 So. 2d 784 (Ala. App. 1990) (Defendant pulled trigger of weapon he believed was loaded, but it did not discharge); *People v. Greiner,* 549 N.Y.S.2d 831 (A.D.2d 1989) (defendant pointed a gun at police officer's chest and attempted to pull the trigger, but the gun did not fire); *People v. Mohammed,* 542 N.Y.S.2d 82 (A.D.2d 1989) (gun jammed when defendant pulled the trigger); *State v. Cabrales,* 392 N.W.2d 347 (Minn. App. 1986) (defendant pointed gun at victim, threatened to kill the victim, and pulled the trigger of the gun two times without it discharging); *Hutchinson v. State,* 477 N. E.2d 850 (Ind. 1985) (defendant pointed loaded gun at police officer, threatened to shoot the officer, and "jerked" the gun twice, which, together with the defendant's statement, gave rise to an inference that the defendant was pulling the trigger); *State v. Bessard,* 461 So.2d 1201 (La. App.3d Cir. 1984) (defendant pulled gun from police officer's holster, pointed it at the officer's chest, and unsuccessfully attempted to fire the weapon); *People v. Seats,* 386 N.E.2d 879 (Ill. App. 1979) (defendant pointed loaded shotgun at police officer and officer heard the gun click, but the gun failed to discharge).

The defendant's final argument is that the defendant did not point his gun at Officer Howells, and therefore the evidence does not support that count of attempted homicide. Our review of the evidence does not concur with the defendant's interpretation of the testimony. In fact, Officer Howells specifically testified that he initially saw the barrel of the gun stick out from the defendant's left armpit pointed in the direction of Officer De La Iglesia. Then, the defendant pivoted his body from right to left and pointed the gun directly at Officer Howells and pulled the trigger several times. Officer Howells testified that he was able to clearly observe the gun because he was positioned only about 12 yards behind the defendant, and the area was illuminated by overhead lights along in the parking lot and along Hamilton Street, and by the headlights of his parked police vehicle. These observations by Officer Howells were further supported by the testimony of Officer Pammer who stated that he saw the defendant point his gun at both Officer Howells and Officer De La Iglesia.

Based on all the evidence presented, the Commonwealth has established a prima facie case of the attempted murder of Officer Howells and Officer De La Iglesia.

## B. *Aggravated Assault,*
18 Pa.C.S. §2702(a)(1), (2) and (4)

The defendant also claims that the evidence presented at the hearings failed to establish a prima facie case with respect to the above-referenced sections of the aggravated assault statute. It is alleged that the Commonwealth

failed to demonstrate that the defendant had the requisite intent to harm Officers Howells and De La Iglesia. Instead, the defendant suggests that pointing a revolver with five spent casings only supports a charge of simple assault.[38]

The pertinent sections of the aggravated assault statute require the following:

"A person is guilty of aggravated assault if he:

"(1) attempts to cause serious bodily injury to another . . .

(2) attempts to cause . . . serious bodily injury to any of the officers, agents, employees or other persons enumerated in subsection (c) . . .[39]

(4) attempts to cause . . . bodily injury to another with a deadly weapon." 18 Pa.C.S. §2702(a)(1), (2) and (4).

The crime of aggravated assault, as can be determined from these definitions, does not require serious bodily injury or even bodily injury. It does, however, require an attempt to inflict injury and an intent to do so. *Commonwealth v. Matthew,* 589 Pa. 487, 909 A.2d 1254 (2006) (sufficient evidence to establish aggravated assault under 2702(c)(1) where defendant placed a gun against victim's throat, repeatedly pointed it at him, and threatened to kill him seven to 10 times); *Commonwealth v. Smith,* 426 Pa. Super. 144, 154-55, 626 A.2d 614, 620 (1993) (evidence was sufficient to establish aggravated assault under

38. 18 Pa.C.S. §2701(a)(3)—"A person is guilty of assault if he . . . attempts by physical menace to put another in fear of imminent serious bodily injury."

39. 18 Pa.C.S. §2702(c)(1)—Police officer.

2702(A)(1), (4) where defendant pointed an unloaded gun, with his finger on the trigger, at his ex-wife and threatened to shoot her and return if anyone called the police).

The defendant's actions as explained previously constituted a substantial step toward killing Officer Howells and De La Iglesia. He pointed the revolver at them, and pulled the trigger more than one time in an attempt to discharge the firearm at the officers. The only remaining step the defendant would have had to take to inflict serious bodily injury would have been to have a live round in the revolver. It appears from the evidence, including the ballistics report that reflects a fragment of a round discovered near the Hotel Grand matched the defendant's firearm, that the defendant miscounted.

To determine whether the defendant had the intent to inflict serious bodily injury, the totality of the circumstances are evaluated. *Matthew,* 909 A.2d at 1257, reaffirming *Commonwealth v. Alexander,* 383 A.2d 887 (1978). "A person acts intentionally with respect to a material element of an offense when . . . it is his conscious object to engage in conduct of that nature or to cause such a result."[40] "As intent is a subjective frame of mind, it is of necessity difficult of direct proof . . . . Accordingly. . . [i]ntent can be proven by direct or circumstantial evidence; it may be inferred from acts on conduct or from the attendant circumstances." *Commonwealth v. Matthews,* 870 A.2d 924, 929 (Pa. Super. 2005). (internal citations and quotations omitted) For example, if "a person . . . discharges a weapon into an empty residence an aggravated assault charge can be proven if the of-

40. 18 Pa.C.S. §302(b)(1)(i).

fender possesses the requisite intent to cause serious bodily injury or bodily injury via the use of a deadly weapon to another, even though it is impossible for that person to actually cause such injury because of the absence of a person inside the residence." *Lopez,* at 628, 654 A.2d at 1152.

It is especially necessary to consider circumstantial evidence surrounding the element of intent, "[w]here one does not verbalize the reasons for his actions. [W]e are forced to look at the act itself to glean the intentions of the actor. Where the intention of the actor is obvious from the act itself, the finder of fact is justified in assigning the intention that is suggested by the conduct." *Commonwealth v. Hall,* 574 Pa. 233, 241, 830 A.2d 537, 542 (2003), quoting *Commonwealth v. Meredith,* 490 Pa. 303, 416 A.2d 481, 485 (1980). Pointing a firearm at someone's chest and pulling the trigger multiple times, suggests an intent to harm or kill. No other reason exists for such conduct. Generally, the mere pointing might not prove the requisite intent, but when coupled with an attempt to fire the revolver, there is no other logical explanation. The fact that no live rounds were in the revolver does not negate the defendant's intent.

"[I]t is the *intent* to commit a crime, not the possibility of success, that determines whether an act or omission constitutes the crime of *attempt* . . .

"[T]he accused's belief in the external circumstances, not the true reality of the circumstances, is to control the necessary proof to establish an attempt to commit a particular crime, as the focus of attention in determining whether the crime of attempt has been committed is the

culpability of the accused and not the facts or legal issues." 22 C.J.S. Impossibility §151 (2008); see also, 22 C.J.S. Attempts §148 (2008).[41]

Every movement by the defendant in the parking lot of the parking authority substantiates the conclusion that he believed the revolver had live rounds. Likewise, the totality of the circumstances demonstrate that his intent was to discharge those live rounds at the officers. Therefore, a prima facie case has been established on the within aggravated assault charges.

C. Aggravated Assault, 18 Pa.C.S. §2702(a)(6)

The defendant argues that he should be charged with only one count of aggravated assault under 18 Pa.C.S. §2702(a)(6).[42] In particular, the defense alleges that the testimony at the preliminary hearing demonstrated that the defendant pointed his gun at Officer De La Iglesia, but did not point his gun at Officer Howells. Hence, the evidence does not support a charge of aggravated assault under this provision as to Officer Howells.

As we have previously stated, we disagree with the defendant's interpretation of the testimony. Officers Howells and Pammer have specifically testified that they

41. *Commonwealth v. Chance, supra; State v. Unverzagt,* 721 S.W.2d (Mo. App. 1986) (evidence showing defendant, who believed gun was loaded, pointed it at police officer who was four feet away and pulled trigger two or three times was sufficient to show intent to cause serious bodily injury).

42. "*(a) Offense defined.*—A person is guilty of aggravated assault if he: . . . (6) attempts is by physical menace to put any of the officers, agents, employees or other persons enumerated in subsection (c), while in the performance of duty, in fear of imminent serious bodily injury. . . ." 18 Pa.C.S. §2702(a)(6).

clearly observed the defendant point his gun directly at Officer Howells. Officer Howells also observed the defendant pull the trigger several times. Hence, we conclude that the Commonwealth has established a prima facie case under 18 Pa.C.S. §2702(a)(6) as to Officer Howells.

### D. *Attempted Assault of Law Enforcement Officer* 18 Pa.C.S. §2702.1

The defendant has been charged with two counts of criminal attempt—assault of a law enforcement officer under 18 Pa.C.S. §2702.1. This section provides the following:

"(a) *Assault of a law enforcement officer in the first degree.*—A person commits a felony of the first degree who attempts to cause or intentionally or knowingly causes bodily injury to a law enforcement officer, while in the performance of duty and with knowledge that the victim is a law enforcement officer, by discharging a firearm."

The defense contends that the Commonwealth has not met its prima facie burden on these charges because the defendant did not "discharge a firearm."

The word "discharge" is not defined by the crimes code. "[T]he words of a statute are to be construed according to their common or popular meaning unless the context indicates a different construction." *Commonwealth v. Darush,* 256 Pa. Super. 344, 348, 389 A.2d 1156, 1158 (1978); *Education Management Services Inc. v. Department of Education,* 931 A.2d 820, 825 (Pa. Commw. 2007) ("When a statute fails to define a term, the term's ordinary usage applies."). See also, 1 Pa.C.S.

§1903 (words and phrases). In that regard, dictionaries provide a useful source for the ordinary usage. *Fogle v. Malvern Courts Inc.,* 554 Pa. 633, 636-37, 722 A.2d 680, 682 (1999) (the Supreme Court has generally used dictionaries as source material for determining the common and approved usage of a term). See also, *Commonwealth v. Murphy,* 795 A.2d 1025, 1031 (Pa. Super. 2002).

The word "discharge" in the context of a firearm has been defined to mean "to project the missile," "to shoot: let fly; fire."[43] In other words, to cause a firearm to fire. Section 2702.1 references 42 Pa.C.S. §9712(e) to define firearm and, while not using the term discharge, it refers to weapons "which will . . . or may readily be converted to expel a projectile by the action of an explosive or the expansion of gas therein." This language also provides a common sense and suitable definition of discharge.

Here, the firearm did not discharge, but the defendant attempted to discharge the firearm. As previously explained, he took a substantial step toward causing bodily injury to Officers Howells and De La Iglesia with the specific intent in mind to commit such an act. The inability to discharge the firearm because of the five spent rounds does not provide a defense to the charge.

For the foregoing reasons, the Commonwealth has established a prima facie case with respect to this charge.

## II. *Motion Challenging the Constitutionality of the Crime of Assault of Law Enforcement Officer*

The defendant contends that 2702.1 offends due process and is unconstitutional because it is overbroad.

---

43. Webster's Third New International Dictionary, p. 644 (1993).

"Strictly speaking, unconstitutional overbreadth only pertains relative to First Amendment free speech concerns." *Commonwealth v. Duda,* 592 Pa. 164, 185, 923 A.2d 1138, 1150 (2007). "However, the general notion of overbreadth is sometimes applied in non-speech cases where, for example, the question is whether the contested statute sweeps so widely as to punish constitutionally protected, as well as unprotected, activities." *Commonwealth v. Habay,* 934 A.2d 732, 739 (Pa. Super. 2007). See also, *Commonwealth v. Thur,* 906 A.2d 552 (Pa. Super. 2006) (a statute is unconstitutionally overbroad if it punishes constitutionally protected activity as well as illegal conduct); *Commonwealth v. Etchinson,* 916 A.2d 1169, 1173 (Pa. Super. 2007). Therefore, it is the initial responsibility of the court "to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Commonwealth v. Ickes,* 582 Pa. 561, 568, 873 A.2d 698, 702 (2005) (section 904 of the Pennsylvania Game Code was overbroad because it permitted game commission officers to cite non-hunters with failure to provide identification in the absence of any suspicion or investigation). The defendant does not contend that discharging a firearm at a law enforcement officer is a protected act. Instead, it is alleged that the severity of the sentence (40 years) makes the act of attempting to cause bodily injury to a law enforcement officer unconstitutional.

Overbreadth has also been used to challenge a statute which is "arbitrary or capricious because it leads to the imposition of punishment bearing little relation to any . . . government interest." *Commonwealth v. Duda,* 592 Pa. 164, 185, 923 A.2d 1138, 1150 (2007). It appears that in this context, the appellant's claim is a challenge to the

"proportionality" of a particular sentence. However, a successful Eighth Amendment challenge, in a non-capital case, is "exceedingly rare." *Harmelin v. Michigan,* 501 U.S. 957, 1001 (1991) (life sentence for possession of 672 grams of cocaine with intent to distribute even in the absence of a prior criminal history did not violate Eighth Amends ent). *Ewing v. California,* 538 U.S. 11, 17-20, 30-31 (2003) (sentence of 25 years to life imposed on a defendant with a criminal history including felonies under California's "Three Strikes Law" for stealing three golf clubs was constitutional.) See also, *United States v. Angelos,* 433 F.3d 738 (10th Cir.), *cert. denied,* 127 S.Ct. 723, 166 L.Ed.2d 561 (2006) (sentence of 55 years for three counts of possessing a firearm in connection with distribution of small amount of marijuana was not violative of Eighth Amendment). Additionally, the Supreme Court has traditionally permitted state legislatures to determine the length of sentences for felonies. *Rummel v. Estelle,* 445 U.S. 263, 274-76 (1980) ("[O]ne could argue without fear of contradiction by any decision of this court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative."); *Harmelin,* 501 U.S. at 1006 ("The legislature has the power to define criminal punishments without giving the courts any sentencing discretion.").

Mandatory sentencing schemes in non-capital cases are subject to a narrow proportionality analysis under the Eighth Amendment. *Ewing v. California,* 538 U.S. at 20. In that regard, as previously explained, "[a]lthough the proportionality principle applies to sentences for

terms of years, only an extraordinary case will result in a constitutional violation." *United States v. Walker,* 473 F.3d 71, 79 (3d Cir. 2007). The following factors have been utilized in analyzing whether a sentence is so disproportionate that it violates the Eighth Amendment: (1) the gravity of the offense and the harshness of the penalty, (2) the sentences imposed on other criminals in the same jurisdiction; (3) the sentences imposed for commission of the same crime in other jurisdictions. *Solem v. Helm,* 463 U.S. 277, 292 (1983).

Initially, in *Hamelin,* both Justice Scalia in his majority opinion and Justice Kennedy in his concurring opinion noted that throughout this nations history, mandatory sentencing schemes have existed. 501 U.S. at 994-95, 1006. Justice Scalia in that regard explained that while mandatory penalties may be cruel, they are not unusual in the constitutional sense. *Id.* Furthermore, not all the *Solem* factors need to be analyzed if upon initial review the gravity of the offense in relation to the penalty does not offend the Eighth Amendment. Specifically, the Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Walker,* 473 F.3d at 81.

The defendant in *Walker* received consecutive mandatory minimum sentences totaling 55 years for various robberies, and claimed his sentence was grossly disproportionate to his offense. The court of appeals, in rejecting that contention, began by reiterating that "substantial deference [is granted] to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." *Id.* at 82. It then pointed out that Congress passed the legislation "to . . .

protect society by incapacitating those criminals who demonstrate a willingness to repeatedly engage in serious felonies while in possession of firearms, . . . to deter criminals from possessing firearms during the course of certain felonies . . . Congress could with reason conclude that the threat posed to the individual and society by possessing firearms in connection with serious felonies, such as . . . armed robberies and drug trafficking crimes . . . committed is momentous enough to warrant the deterrence and retribution of lengthy consecutive sentences . . . ." *Id.* at 82-83. (internal quotations and citations omitted)

In 1996 the legislature amended the aggravated assault statute and broadened the scope of the statute, "evidencing an intent to protect officers when effectuating all arrests, even those arrests which are subsequently determined to have lacked probable cause at their inception." *Commonwealth v. Biagini,* 540 Pa. 22, 34-35, 655 A.2d 492, 498 (1995). As a result, the legislature determined that those convicted of assaulting officers under section 2702(a)(3) or (6) potentially face a maximum sentence of 10 years. The legislature in 2008 decided that police officers were entitled to even greater protection when firearms are used to endanger them "while in the performance of duty and with knowledge that the victim is a law enforcement officer."[44] It is the legislature's prerogative to do so. See *People v. Banyan,* 833 N.Y.S.2d 841 (2007) (in response to the terrorist acts of September 11, 2001, the New York State Legislature enacted the "Crimes Against Police Act," which increased the minimum sentences for certain offenses involving assaults of police officers, including a

---

44. 18 Pa.C.S. §2702.1(a).

potential 30-year sentence for the crime of aggravated assault upon a police officer).

Any comparison of the defendant's potential sentence of "not more than 40 years" to those cited in *Walker* demonstrates that the sentence for assault of law enforcement officer is not the "rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality ..." *Id.,* quoting *United States v. MacEwan,* 455 F.3d 237, 248 (3d Cir.). The defendant has failed to show a gross imbalance between the crime and the potential sentence, and his constitutional challenge must fail.

The defendant's final constitutional challenge contends that section 2702.1 is unconstitutional under the void-for-vagueness doctrine. The principles of this doctrine have been explained as follows:

"Due process demands that a statute not be vague. *Commonwealth v. Mayfield,* 574 Pa. 460, 832 A.2d 418, 422 (2003); *Commonwealth v. Barud,* 545 Pa. 297, 681 A.2d 162, 165 (1996). A statute is vague if it fails to give people of ordinary intelligence fair notice as to what conduct is forbidden, or if they cannot gauge their future, contemplated conduct, or if it encourages arbitrary or discriminatory enforcement. *Commonwealth v. McCoy,* 895 A.2d 18, 30 (Pa. Super. 2006). A vague law is one whose terms necessarily require people to guess at its meaning. *Mayfield,* 832 A.2d at 422. If a law is deficient —vague—in any of these ways, then it violates due process and is constitutionally void. *Id.*

"By contrast, to be valid, a penal statute must set forth a crime with sufficient definiteness that an ordinary person can understand and predict what conduct is prohib-

ited. *McCoy,* 895 A.2d at 30. The law must provide reasonable standards which people can use to gauge the legality of their contemplated, future behavior. *Mayfield,* 832 A.2d at 422; *Barud,* 681 A.2d at 165; *Commonwealth v. Mikulan,* 470 A.2d at 1343 (Pa. 1983) (plurality); *McCoy,* 895 A.2d at 30.

"At the same time, however, the void for vagueness doctrine does not mean that statutes must detail criminal conduct with utter precision. 'Condemned to the use of words, we can never expect mathematical certainty from our language.' *Mikulan,* 470 A.2d at 1343 (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 110-12, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). Indeed, due process and the void for vagueness doctrine are not intended to elevate the 'practical difficulties' of drafting legislation into a 'constitutional dilemma.' *Id.* (quoting *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972)). Rather, these doctrines are rooted in a 'rough idea of fairness.' *Id.* As such, statutes may be general enough to embrace a range of human conduct as long as they speak fair warning about what behavior is unlawful. *Id.* Such statutes do not run afoul of due process of law. *Id.*" *Commonwealth v. Baxter,* 956 A.2d 465, 468-69 (Pa. Super. 2008), quoting *Commonwealth v. Thur,* 906 A.2d 552, 560 (Pa. Super. 2006). See also, *Kolender v. Lawson,* 461 U.S. 352, 357-358 (1983); *Commonwealth v. Davidson,* 595 Pa. 1, 17, 938 A.2d 198, 207 (2007).

Void-for-vagueness challenges must overcome the "strong presumption" that the legislation is constitutional, and the defendant bears a heavy burden to prove otherwise. In other words, such challenges will only be successful if the defendant can demonstrate that the

statute clearly, palpably violates the federal or state constitutions. *Id.*

The defendant contends that this statute is vague with regard to his particular conduct. It is alleged in the defendant's "omnibus pretrial motions . . ." that the statute is unconstitutional because its "plain language . . . does not include an unloaded weapon," and the term "discharge requires that the gun actually be fired."

This claim cannot withstand scrutiny for a variety of reasons. The statute gives fair notice to people of "ordinary intelligence" that they should not either attempt to or harm police officers in the performance of their duty. Even someone who is not a rocket scientist would realize that this statute prohibits them from either discharging a firearm or attempting to discharge a firearm at a police officer. Additionally, the fact that five spent casings were in the firearm does not make the statute void-for-vagueness. The issue is whether the defendant took a substantial step towards causing bodily injury to the officers with the specific intent to do so. The statute does not need to explain every possible machination that may result in harm to a police officer to avoid a vagueness challenge. It may be "general enough to embrace a wide range of human conduct" as long as there is fair warning about the unlawful conduct.

Finally, it cannot be seriously argues that the statute "encourages arbitrary or discriminatory enforcement." Pointing a gun at a police officer will get anyone arrested.

For the foregoing reasons, the defendant's constitutional challenges are dismissed.

### III. *Motion To Suppress Statements Made at Lehigh Valley Hospital*

The defendant asserts that the statements he made to the police during his interviews at Lehigh Valley Hospital should be suppressed because (1) they were the result of an unnecessary delay between arrest and arraignment, and (2) the statements were not voluntary. For all the reasons set forth below, we find that both claims lack merit.

In *Commonwealth v. Perez,* 577 Pa. 360, 845 A.2d 779 (2004), the Supreme Court abrogated the *Duncan-Davenport* six-hour rule and held that "voluntary statements by an accused, given more than six hours after arrest when the accused has not been arraigned, are no longer inadmissible per se." *Id.* at 373, 845 A.2d at 787. Instead, the totality of the circumstances was adopted to determine whether a pre-arraignment statement was freely and voluntarily made by the accused. Here, any potentially inculpatory statements were made by the defendant after arraignment. Therefore, there could be no unnecessary delay resulting in the suppression of statements because there were no pre-arraignment statements.

In any event, when a defendant is arrested, he must be afforded a preliminary arraignment by the proper issuing authority without an unnecessary delay.[45] The purpose of a preliminary arraignment is to inform the defendant of the nature of the charges against him, of his right to counsel, of his right to bail, and of his right to a preliminary hearing.[46] "However, any period of delay attributable to an accused's impaired mental or physical

---

45. Pa.R.Crim.P. 519.
46. Pa.R.Crim.P. 540(E).

condition is 'necessary delay,' and thus, must be excluded when determining whether a statement has been obtained as a result of 'unnecessary delay.'" *Commonwealth v. Bracey,* 541 Pa. 322, 333-34, 662 A.2d 1062, 1067 (1995), quoting *Commonwealth v. Williams,* 484 Pa. 590, 400 A.2d 1258 (1979).

In this case, the record is clear that the defendant's medical condition prevented him from being arraigned or interviewed by the police until April 23, 2009. Before this date, the defendant was receiving intensive medical attention for his gunshot wounds and remained intubated[47] until April 21, 2009. Sergeant Lake was in daily contact with the medical staff at the hospital regarding the defendant's condition in order to ascertain when the defendant was capable of being arraigned and interviewed. The first opportunity was on April 23, 2009. Accordingly, any delay until April 23, 2009 was necessary, and therefore, excusable under Pa.R.C.P. 519.

Regarding the defendant's second argument, the defense claims, in particular, that the defendant invoked his right to silence during the first interview on April 23, 2009, and also that he did not knowingly, voluntarily, and intelligently waive his *Miranda* warnings during the second interview on April 23, 2009.

*Miranda* warnings are required where a suspect is subjected to custodial interrogation. *Commonwealth v. Ford,* 539 Pa. 85, 98, 650 A.2d 433, 438 (1994); *Commonwealth v. Ingram,* 814 A.2d 264, 271 (Pa. Super. 2002). Custodial interrogation is defined as "questioning

---

47. Intubation is the placement of an endotracheal tube into the trachea in order to maintain an open airway in patients who are unconscious or unable to breathe on their own.

initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" and is confined to interactions in which the "police should know that their words or actions are reasonably likely to elicit an incriminating response." *Miranda v. Arizona,* 384 U.S. 436, 444 (1966); *Commonwealth v. Ingram,* 814 A.2d at 271. Here, the parties agree that *Miranda* rights were required prior to interviewing the defendant. *Commonwealth v. Smith,* 575 Pa. 203, 836 A.2d 5, 18 (2003); *Commonwealth v. Ford, supra.*

Sergeant Lake testified that both he and Detective Millan initially attempted to interview the defendant on the morning of April 23, 2009. The defendant argues that the police ignored and failed to honor his statement that he did not want to talk. "If the [defendant] indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda,* 384 U.S. at 473-74. The police may not thereafter entice the defendant to abandon his right to remain silent. *Commonwealth v. Harris,* 972 A.2d 1196, 1204 (Pa. Super. 2009), citing *Commonwealth v. Henry,* 410 Pa. Super. 324, 332, 599 A.2d 1321, 1325 (1991). The defendant's contention that he indicated to Detective Millan and Sergeant Lake that he did not want to talk is inaccurate. The defendant points specifically to his statement of "no," in support of this argument. However, it is clear from the audiotape of this interaction that this statement was made specifically in response to Sergeant Lake's question, "May I audiotape our conversation?" The defendant never indicated that he did not want to speak to the officers. *Connecticut v. Barrett,* 479 U.S. 523, 529-30 N3 (1987) (defendant's agreement to answer

oral questions but not give any written statement without counsel present was unequivocal waiver of his right to remain silent). *Hughes v. Grace,* 2008 WL 2048663 (M.D. Pa. 2008) (refusal of defendant to have his statement transcribed or taped does not affect the waiver of the right to remain silent).

Detective Millan and Sergeant Lake attempted to interview the defendant a second time on April 23, 2009, at 2:30 p.m. Upon their arrival at the defendant's hospital room, the defendant was awake and alert. Sergeant Lake began by asking the defendant biographical questions and then read the defendant his *Miranda* rights. The defendant's demeanor was attentive and coherent and the defendant indicated that he understood his rights and he wished to speak with the officers.

Any statements secured from the defendant after *Miranda* rights are provided and waived are admissible provided the accused's right to remain silent and right to counsel have been explained and the accused has knowingly and voluntarily waived those rights. *Commonwealth v. Jones,* 546 Pa. 161, 178, 683 A.2d 1181, 1189 (1996). "The test for determining the voluntariness of a confession and whether an accused knowingly waived his or her rights looks to the totality of the circumstances surrounding the giving of the confession." *Id.* Here, the defendant contends that the Commonwealth failed to establish a knowing and voluntary waiver of his *Miranda* rights. *Commonwealth v. Pruett,* 597 Pa. 307, 313, 951 A.2d 307, 318 (2008). The testimony at the suppression hearing proves otherwise.

When evaluating the totality of the circumstances, the suppression court should consider the duration and the

methods of interrogation; the conditions of the detention, the manifest attitude of the police toward the defendant, the defendant's physical and psychological state and all other conditions present which may serve to drain one's power of resistance to suggestion and undermine his self-determination. *Perez,* 845 A.2d at 787.[48] In this case, the duration of the interview, the tone of the interview, and the conditions of detention, all point to a valid waiver of *Miranda* rights. The duration of the defendant's interview was approximately 30 minutes, the tone of the interview was cordial, and the defendant's demeanor was calm and attentive. There is no evidence of coercion. As a result, the first part of the voluntariness evaluation has been satisfied by the Commonwealth.

The defense primarily argues that the defendant's physical and psychological condition were weakened by the gunshot wound sustained only five days earlier, and by his need for medical treatment. As a result, the defendant claims that he was unable to waive his *Miranda* rights.

In determining whether the defendant's statements were properly obtained we must examine the implications of the defendant's physical condition. Various courts of this Commonwealth have addressed "the legality of confessions obtained when the accused is suffering from

---

48. The court in *Perez* also identified as other relevant factors "the accused's age; his level of education and intelligence; the extent of his previous experience with police; the repeated and prolonged nature of the questioning; the length of detention prior to the confession; whether he was advised of his constitutional rights; whether he was injured, ill, drugged, or intoxicated when he confessed; whether he was deprived of food, sleep, or medical attention; and whether he was physically abused or threatened with abuse." *Perez,* 845 A.2d at 785, citing *People v. Cipriano,* 431 Mich. 315, 429 Nl. W.2d 781 (1988).

medical infirmities," and have determined that confessions can be voluntary even when a defendant is suffering from a physical impairment or is hospitalized. Notably, in *Commonwealth v. Hunt,* 263 Pa. Super. 504, 398 A.2d 690 (1979), the defendant was interviewed at the hospital while being treated for a knife wound. The investigating detective described the defendant's condition in the following manner:

"'He was laying on the litter. He told me he was in pain. He said his stomach was hurting, but he answered questions candidly. Everything I asked him seemed to make sense with his answers.' . . . Additionally, Nespoli advised appellant of all required *Miranda* warnings and asked a doctor, present in the room during the interview, if it would be all right to speak with appellant. The doctor replied yes. Appellant indicated he understood his constitutional prerogatives, that he did not want to continue later and that he would talk at that time. Nespoli further stated appellant did not appear to be in a drugged condition and that no promises or threats of any kind were employed to obtain the statement. Appellant offered no testimony at the suppression hearing to rebut the detective's assertions." *Id.* at 510, 398 A.2d at 693.

Based on the totality of the circumstances the court determined that the confession by the defendant was voluntary. Likewise, in *Commonwealth v. Johnson,* 556 Pa. 216, 236, 727 A.2d 1089, 1099 (1999), a statement obtained from the defendant after he was shot, and while he was being transported to the hospital for treatment, was voluntarily, knowingly, and intelligently made. *Id.* at 236, 727 A.2d at 1099. The court in *Johnson* noted

that the defendant's condition was not so impaired as to render him incapable of voluntarily describing to the police how he had been shot. *Id.* Further, in the case of *Commonwealth v. Ellis,* 700 A.2d 948 (Pa. Super. 1997), the defendant's confession was voluntary even though he had undergone surgery earlier in the day for a gunshot wound and was medicated. The court in *Ellis* recognized that there was no evidence to show that the defendant's cognitive functions were impaired. *Id.* at 955. See also, *Commonwealth v. McQuaid,* 273 Pa. Super. 600, 417 A.2d 1210 (1980) (a small gunshot wound to the head did not render a statement involuntary).

By contrast, confessions have been suppressed in cases where a court has determined that the circumstances surrounding a confession demonstrate an egregious disregard for the defendant's constitutional rights. For instance, in *Commonwealth v. Walker,* 470 Pa. 534, 368 A.2d 1284 (1977), a confession was deemed involuntary where the appellant, just prior to the interrogation, had been knocked unconscious, was intoxicated and groggy, and was suffering from a badly swollen eye. Similarly, in *Commonwealth v. Hallowell,* 444 Pa. 221, 282 A.2d 327 (1971), a confession was involuntary where it was obtained only 30 minutes after the appellant was shot five times, blackjacked and pistol whipped about the head. Lastly, in the case of *Commonwealth ex rel. Gaito v. Maroney,* 422 Pa. 171, 220 A.2d 628 (1966), the court suppressed a confession that was taken four hours after the appellant underwent surgery for a serious bullet wound and was administered heavy doses of sedatives and other medications.

In this case, the facts suggest that the police adequately protected the defendant's constitutional rights. When the defendant made inculpatory statements to the police he was five days post-operative, he did not appear to be under the influence of medication, and he did not exhibit signs that he was in discomfort or pain. In fact, Nurse Worman testified that in her opinion the medication had worn off. Detective Millan and Sergeant Lake described the defendant's demeanor during the interaction as alert, conscious, talking, attentive, cooperative, and responsive. The officers engaged in conversation with the defendant for only 30 minutes, which included a break when Detective Millan provided the defendant with a drink. The defendant was coherent throughout the interaction, and was able to comprehend questions and to formulate responsive answers. The officers noted in particular that the defendant was able to correctly answer their introductory biographical questions. At the end of the interview the defendant was upbeat and even requested a business card from Detective Millan. Accordingly, it is evident that the defendant's statements were not compromised by any physical or psychological impairment.

Furthermore, aside from his admission to possessing a firearm for protection, the defendant's responses were limited. He did not make any inculpatory statements about the shootings either involving the officers or at the Hotel Grand. It can hardly be argued that the defendant's resistance to suggestion was undermined or his will was overborne in light of his statements.

The voluntariness of a confession may be based solely on the credible testimony of the investigating officer. *Commonwealth v. Cornish,* 471 Pa. 256, 370 A.2d

291 (1977); *Commonwealth v. Smith,* 447 Pa. 457, 291 A.2d 103 (1972). Given the testimony of Detective Millan and Sergeant Lake, we find that "the Commonwealth has established by a preponderance of the evidence that the [defendant] . . . had sufficient cognitive awareness to understand the *Miranda* warnings and to choose to waive his rights." *Commonwealth v. Ventura,* 975 A.2d 1128, 1138 (Pa. Super. 2009). (footnote omitted)

The defendant's final argument, which was raised at the time of the hearings, is that his statements to police are inadmissible because Eric Dowdle, Esquire, was denied access to the defendant during his hospitalization. This argument lacks traction for several reasons. First, our courts have rejected the argument that the police must inform a defendant that an attorney has tried to contact him. In *Moran v. Burbine,* 475 U.S. 412 (1986), the police refused to grant an attorney access to the defendant, who had validly waived his *Miranda* rights during interrogation. The court decided that, under the Fifth Amendment, this refusal by the police did not invalidate a proper waiver. The court reasoned that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422. See also, *Commonwealth v. Arroyo,* 555 Pa. 125, 723 A.2d 162 (1999).

Attorney Eric Dowdle testified that, on the date of the shooting, he represented the defendant in an unrelated case. He testified that he read a *Morning Call* article about the shooting, and that the defendant was hospitalized. He called Detective Lake to ask about the defendant's condition, and to arrange a meeting with the defendant at

the hospital. Detective Lake declined because the defendant had made no request to see Attorney Dowdle. Although Attorney Dowdle, sometime afterward, spoke with the defendant's wife, he was not hired to represent the defendant. In short, Attorney Dowdle's involvement in this case was limited. He never expressed a desire to be present with the defendant during any police questioning. For this reason, the police had no obligation to inform the defendant that Attorney Dowdle wanted to talk to him.[49]

Lastly, as explained above, Attorney Dowdle's representation of the defendant involved criminal charges in an unrelated case, and Attorney Dowdle was never hired by the defendant for the instant case. "The Sixth Amendment right to counsel is offense-specific and, therefore, does not prevent a suspect from being questioned about an unrelated crime." *Commonwealth v. Gwynn,* 596 Pa. 398, 409-10, 943 A.2d 940, 947 (2008), guoting *McNeil v. Wisconsin,* 501 U.S. 171, 175 (1991). Moreover, the fact that Attorney Dowdle represented the defendant in another matter did not automatically constitute an invocation by the defendant of his Fifth Amendment right to counsel and thereby bar police questioning in this case. See *Commonwealth v. Steward,* 775 A.2d 819, 827 Pa. Super. 2001).

In conclusion, based upon the evidence introduced at the suppression hearing, the Commonwealth has satisfied its burden of establishing that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights.

49. Cf. *Commonwealth v. Hilliard,* 471 Pa. 318, 370 A.2d 322 (1977), which the Supreme Court declined to follow in *Arroyo, supra,* in light of *Moran v. Burbine, supra.*

For all the reasons discussed above, the motion to suppress the defendant's statements is denied.

IV. *Motion To Suppress Identification of Defendant*

The defendant in his motion contends that his identification by Joseph Perez using a photographic array should be suppressed. Specifically, he argues that the photographic array was unduly suggestive and that the circumstances of the identification procedure created a substantial likelihood of misidentification. Counsel for the defendant in her "brief in support of defendant's pretrial motions" has decided not to pursue this issue because of the conflicting testimony of Detective Tallarico and Joseph Perez at the hearings in this matter. For purposes of completeness, the identification procedure will be addressed.

"Generally, a pretrial identification may be inadmissible at trial if it was obtained by a procedure so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny the accused due process." *Commonwealth v. Voss,* 335 Pa. Super. 331, 337, 482 A.2d 593, 596 (1984). "[P]hotograph identification [of a person] is unduly suggestive" if, under the totality of the circumstances, the identification "procedure creates a substantial likelihood of misidentification." *Commonwealth v. Crork,* 966 A.2d 585, 588 (Pa. Super. 2009). "Photographs utilized in lineups will not be deemed unduly suggestive if the suspect's picture does not stand out more than those of the other individuals included in the array and the people depicted in it all exhibit similar facial characteristics." *Commonwealth v. Harris,* 888 A.2d 862, 866 (Pa. Super. 2005), citing *Commonwealth v. Fisher,* 564 Pa. 505, 522-23, 769 A.2d 1116, 1127

(2001). See also, *Commonwealth v. Johnson,* 542 Pa. 384, 668 A.2d 97 (1995) (Upholding the trial court's determination that a photo array containing eight photographs of various individuals with similar facial hair, features and "outlines" was not unduly suggestive). The burden is on the Commonwealth to demonstrate that the identification procedure was not overly suggestive. *Id.* at 397, 668 A.2d at 103.

In this case, Detective Lewis Collins created a photographic array using the CPIN network.[50] The CPIN network is a computer program that randomly identifies other persons with the best picture matches to the defendant in order to create a photographic lineup.[51] The array contains the photographs of eight individuals, with the defendant at position number four. The individuals within the array are of the same gender, ethnic group, and physical characteristics as the defendant. Specifically, the photographic array consists of eight African American males with similar features. Each of the persons in the array have short black hair, some facial hair, the same general complexion, and are within the same age group. This array was presented by Detective Luis Tallarico to Mr. Perez on April 18, 2009, within two hours of the shooting incident. Mr. Perez was shown the photographic array at police headquarters and was asked if he recognized anyone as being involved in the shooting incident. Mr. Perez looked at the array and within one minute pointed to the defendant and stated, "That was the individual involved in the initial fight inside the bar, and that was also the person that he saw pull a handgun

---

50. N.T.P.T.M. 2/24/10, p. 115.
51. N.T.P.T.M. 2/24/10, pp. 119-20.

from his waistband and fire several shots."[52] Mr. Perez identified the person he believed to be the perpetrator in the array by circling the defendant's photograph, initialing and dating the array. Detective Tallarico testified that he did not direct Mr. Perez to select the defendant, or any other person, from the array.

It is clear that the photographic array contains eight photographs of individuals with similar facial features and that there is no evidence to demonstrate that the police exhibited any behavior that would indicate to the witness who should be selected from the array. Accordingly, the motion to suppress regarding the use of the photographic array is denied.

It is important, however, to recognize that Mr. Perez and Detective Tallarico presented conflicting testimony regarding the identification of the defendant in the photographic array. In particula Mr. Perez testified at a hearing in this matter, that he never definitively identified the defendant as the shooter, and that he was only able to say that the shooter had similar physical characteristics as the person in the photographic array at position number four. It is clear from this testimony that there is a serious dispute regarding these events. This dispute is factual in nature and does not impact the outcome of the instant motion to suppress, which addresses only the lawfulness of the creation and presentation of the photographic array. A factual dispute of this type will impact the weight of the evidence, not the admissibility of the evidence. Accordingly, it will be for the finder of fact to weigh the conflicting versions of events.

---

52. N.T.P.T.M. 2/24/10, pp. 152, 153.

## ORDER

And now, August 30, 2010, after hearings, and upon consideration of the defendant's "omnibus pretrial motions pursuant to Pa.R.Crim.P. 578," and for all the reasons set forth in this accompanying opinion;

It is hereby ordered that the "omnibus pretrial motions pursuant to Pa.R.Crim.P. 578" are denied:

(1) The defense motion for a writ of habeas corpus on the charge of attempted homicide is denied.

(2) The defense motions for a writ of habeas corpus on the charges of aggravated assault are denied.

(3) The defense motion for a writ of habeas corpus on the charge of criminal attempt—assault of a law enforcement officer under 18 Pa.C.S. §2702.1 is denied.

(4) The defense motion challenging the constitutionality of the crime of assault of a law enforcement officer under 18 Pa.C.S. §2702.1 is denied.

(5) The defense motion to suppress statements is denied.

(6) The defense motion to suppress the defendant's identification is denied.