J-S66013-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| SHANE DOUGLAS PITTMAN, | |
| Appellant | No. 835 MDA 2014 |

Appeal from the Judgment of Sentence Entered November 21, 2011
In the Court of Common Pleas of Fulton County
Criminal Division at No(s): CP-29-CR-0000271-2009

BEFORE:  BENDER, P.J.E., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED NOVEMBER 18, 2014**

Appellant, Shane Douglas Pittman, appeals from the judgment of sentence of 20-40 years' incarceration, imposed following his conviction for third degree murder.  The sole issue in this direct appeal is whether there was sufficient evidence of malice to sustain Appellant's conviction.  After careful review, we affirm.

On February 1, 2010, Appellant was charged by criminal information with criminal homicide and endangering the welfare of children.  Appellant initially pled guilty to the offense of third degree murder on May 12, 2011.  However, he subsequently withdrew his plea on July 1, 2011.  On September 21, 2011, the trial court *nolle prossed* the endangering the welfare of children charge at the Commonwealth's request.  Appellant's jury trial commenced on September 28, 2011, and on September 29, 2011, the jury

convicted Appellant of third degree murder. The following facts were presented at Appellant's trial:

[T]wo-year-old Kylie York ("Kylie") died on December 5, 2009, from blunt force trauma to the head and neck.

On December 2, 2009, Shannon Wood ("Wood"), Kylie's mother and [Appellant]'s girlfriend, returned home from work at 1:00 p.m. to find her daughter "asleep" on the couch. [Appellant], who had been watching Kylie while her mother worked, informed Wood that Kylie had vomited. Since Kylie [complained of] a stomach ache the day before, Wood called and made an appointment with Kylie's pediatrician. When Wood attempted to wake Kylie to take her to her doctor's appointment, she was unable to do so. [Appellant] and Wood rushed Kylie to the Fulton County Medical Center. In the evening of December 2, 2011, Kylie was transferred to Hershey Medical Center [(HMC)]. Despite the efforts of a team of pediatricians in the Pediatric Care Unit at Hershey Medical Center, Kylie died on December 5, 2009.

Trial Court Opinion (TCO), 6/17/2014, at 1-2 (internal citations omitted).

Kylie had spent Thanksgiving with her father, who returned the girl to Wood on Sunday, November 29, 2009. Although Wood noticed that Kylie had a bruise on her head, she indicated that, over the next few days, Kylie did not seem abnormal in any way. Wood testified that apart from the stomach ache the night before, Kylie was also in a normal condition while Wood was getting ready to leave for work at 7:45 a.m. on December 2, 2009. At that time, Wood gave Kylie something to eat, turned on a movie, and left her on the bed where Appellant was still sleeping. Wood's shift started at 8:00 a.m.

Appellant's testimony confirmed that he was home alone with Kylie on the morning of December 2, 2009, until Wood returned at 1:00 p.m. He

- 2 -

awoke at about 8:00 a.m., when Wood was leaving for work, but he and Kylie both dozed off soon thereafter. When he re-awoke, Kylie was still at the foot of the bed, watching a blank screen. He took her to the kitchen where he fed her some sherbet, but she only took a few bites. He then tried to color with Kylie in the living room, an activity they enjoyed doing together before. After coloring for a while, Kylie threw up. Appellant

> carried her to the bathroom to clean her up. Kylie then helped dress herself and walked to the coach where she lay down and asked for her mom and a cup of juice. Kylie then fell asleep and never woke up. On the stand, [A]ppellant denied that he told police [that] Kylie's head had snapped back and forth approximately ten times as he ran with her from the living room to the bathroom or that he had dropped Kylie into the tub. [Appellant] admitted that he used the words "snapped" and "dropped" in two written statements but only because they were suggested by the [interviewing policemen].

TCO, at 5 (internal citations omitted).

The Commonwealth presented several expert witnesses who "painted a very different picture of the events of December 2, 2009." *Id.* These experts testified that "the injuries sustained by Kylie could not have been caused by simply running with her from the living room to the bathroom as [Appellant] alleged to police and later to the jury." *Id.* at 6.

Dr. Samuel Land, a forensic pathologist, performed the autopsy on Kylie. He testified that Kylie died "as a result of blunt force trauma to the head and neck." N.T., 9/28/11, at 50. He indicated that there was a whiplash-type injury to the ligaments holding Kylie's head to the top of her neck, "three separate impact sites to her head[,]" as well as "some type of

rotational damage" to the brain. *Id.* at 51, 55. This type of damage would have caused a "rapid decrease in [Kylie's] ability to perform normal activities" in "seconds to minutes." *Id.* at 57.

Dr. Land specifically rejected the idea that Kylie could have sustained such severe injuries and remained lucid for several days afterward. *Id.* at 57-58. He also rebuffed the notion that her injuries could have occurred as a result of "quickly picking Kylie up, quickly running with her down the hallway, and dropping her in a[n empty bathtub][.]" *Id.* at 59. Additionally, Dr. Land rejected that Kylie's injuries could have been caused or facilitated by several of the theories offered by Appellant's expert witness, described *infra*. Dr. Land indicated that he had only observed injuries as severe as those sustained by Kylie in car accidents and high falls, although he noted that he was "aware of other instances" where children had sustained similar injuries, such as when "a child has been accidentally struck in the head with a tree branch or a baseball bat or [by] bricks … fallen from buildings, things like that." *Id.*

Dr. Daniel Brown, a neuropathologist, examined Kylie's brain and spinal cord after her death. He testified that Kylie suffered from numerous hemorrhages of the brain and spinal cord, all of which were "fresh, or less than three-day[s]-old." *Id.* at 76. He also detected a brain bruise on the left temporal region of Kylie's brain. He indicated that in the pediatric population, such bruises only result after the application of a significant amount of force. He also indicated that there was a "rotation or shaking

- 4 -

motion of the brain … [t]hat would not have spontaneously happened." *Id.* at 81.

Dr. Robert Tamburro, Jr., a pediatric critical care physician, cared for Kylie during her hospitalization at HMC. When he began treating Kylie, her pupils were not reacting to stimuli, a "very worrisome sign of severe injury." *Id.* at 121. The pressure created by bleeding in the subdural space of Kylie's brain was "astronomically high." *Id.* at 126. Dr. Tamburro indicated that although the most common and likely source of Kylie's injuries was physical trauma, he and the staff at HMC tested Kylie for other potential causes. The results of those tests showed that there were no "inborn errors of metabolism[,]" severe dehydration, or clotting issues (coagulopathy) which could have caused the subdural bleeding in Kylie's brain. *Id.* at 127-29. Dr. Tamburro also indicated that tests did not show any evidence of an infection. Ultimately, Dr. Tamburro concluded that Kylie's condition and subsequent death had been caused by injury rather than an illness, although he declined to opine regarding whether her injuries were accidental.

Dr. Kathryn Cromwell, a member of the child safety team at HMC, examined Kylie's medical records and test results and concluded that Kylie had suffered compression fractures of her thoracic vertebrae. Dr. Cromwell indicated that compression fractures of that nature were unlikely in children even if they fell from "a significant height and land[ed] directly on their butt[.]" *Id.* at 161. She said it would be "very rare" for such injuries to

occur "from falling from a standing height, or falling while running, or failing off a sofa, something [of] that nature." *Id.*

Consequently, Dr. Cromwell concluded that Kylie suffered from an "inflicted brain injury." *Id.* at 162. She specifically rejected that anything that occurred during Appellant's version of events could have caused Kylie's injuries:

> Q.    Could the injuries that resulted in her death … been caused by [Appellant's] picking Kylie up quickly, if she were on the floor, say lying on the floor, sitting on the floor, picking her up very quickly, could that have cause these injuries?
>
> A.    No, it could not.
>
> Q.    What about [Appellant's] carrying her down a hallway, running with her, holding her in his hands out in front?
>
> A.    No, that could not have cause her injuries.
>
> Q.    Could these injuries that you described, inflicted injuries, have been caused by [Appellant's] dropping Kylie into a dry bathtub from about two feet?
>
> A.    Th[at] wouldn't have caused all of her injuries. It's possible it might have contributed to her fractures but not to her brain injury.
>
> Q.    Could these injuries have been caused by [Appellant's] restraining Kylie in a bathtub while he was trying to bathe her and she was trying to get out?
>
> A.    I do not believe so.
>
> Q.    Could Kylie have self-inflicted the kind of injuries that you saw, say, I don't know, by jumping on like a trampoline, or on a bed  flying off and hitting the night stand, or something like that?
>
> A.    No, she could not.

*Id.* at 162-63.

On November 21, 2011, the trial court sentenced Appellant to a term of 20-40 years' incarceration. Appellant filed a timely post-sentence motion on November 29, 2011, alleging that the Commonwealth had failed to disclose evidence of a phone call that Appellant had made while imprisoned prior to trial. On December 15, 2012, Appellant filed a notice of appeal with this Court, even though the trial court had yet to rule on his post-sentence motion. Appellant then field a Praecipe to Discontinue Appeal on January 13, 2012. In an order and opinion dated February 15, 2012, the trial court denied Appellant's post-sentence motion. No appeal was taken from that order.

On January 28, 2013, Appellant filed a timely petition for relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. § 9541 *et seq.*, seeking reinstatement of his direct appeal and post-sentence motion rights *nunc pro tunc*. By opinion and order dated April 29, 2014, the PCRA court reinstated Appellant's direct appeal rights but denied his request to reinstate his post-sentence motion rights. On May 9, 2014, Appellant filed a *nunc pro tunc* notice of appeal from his judgment of sentence.

On May 13, 2014, the trial court ordered Appellant to file a Pa.R.A.P. 1925(b) statement, and Appellant complied with that order by filing his Rule 1925(b) statement on June 6, 2014. The trial court issued its Rule 1925(a) opinion on June 17, 2014.

Appellant now presents the following question for our review:

Whether the verdict of Third Degree Murder was supported by sufficient evidence of a purposeful act committed with malice, where the acts alleged were that Appellant, in an effort to expedite care for the child, ran down the hallway with the child's head and shoulders jerking back and forth, in addition to restraining her in a bathtub while her head and body hit the inside of the bathtub?

Appellant's Brief at 6.

Our standard of review of sufficiency claims is well-settled:

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

The statutory definition of third degree murder is provided by reference to first and second degree murder as follows:

**(a) Murder of the first degree.--**A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

**(b) Murder of the second degree.--**A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

**(c) Murder of the third degree.--**All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.

18 Pa.C.S. § 2502.

> Case law has further defined the elements of third degree murder, holding:
>
>> [T]o convict a defendant of the offense of third[ ]degree murder, the Commonwealth need only prove that the defendant killed another person with malice aforethought. This Court has long held that malice comprehends not only a particular ill-will, but ... [also a] wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.
>
> *Commonwealth v. Santos*, 583 Pa. 96, 876 A.2d 360, 363 (2005) (alteration in original) (internal citation, quotation, and emphasis omitted); *see also Commonwealth v. Drum*, 58 Pa. 9, 15 (1868) (defining malice as quoted above). This Court has further noted:
>
>> [T]hird degree murder is not a homicide that the Commonwealth must prove was committed with malice and without a specific intent to kill. Instead, it is a homicide that the Commonwealth must prove was committed with malice, but one with respect to which the Commonwealth need not prove, nor even address, the presence or absence of a specific intent to kill. Indeed, to convict a defendant for third degree murder, the jury need not consider whether the defendant had a specific intent to kill, nor make any finding with respect thereto.
>
> *Commonwealth v. Meadows*, 567 Pa. 344, 787 A.2d 312, 317 (2001) (quoting *Commonwealth v. Young*, 561 Pa. 34, 748 A.2d 166, 174–75 (1999)).

*Commonealth v. Fisher*, 80 A.3d 1186, 1191 (Pa. 2013), *cert. denied*, 134 S. Ct. 2314, (2014).

Appellant claims that the Commonwealth did not present sufficient evidence of malice because there were no other eyewitnesses to the events of December 2, 2009, and Appellant's own account of those events

presented a "caretaker faced with a sudden emergency and quickly responding by moving the injured Kylie to the bathroom as fast as possible." Appellant's Brief at 14. Despite the fact that the Commonwealth's medical experts determined that Kylie could not have sustained her injuries in a manner consistent with Appellant's account of events on that date, he argues that:

> The evidence presented at trial [in] this matter is the exact type that lends itself to conjecture; experts testifying that because the injury cannot be explained as described by [Appellant], then it follows that [Appellant] must be guilty of third degree murder. This is patently insufficient and a deduction that cannot survive legal scrutiny.

Appellant's Brief at 14.

The Commonwealth concedes that "[w]hat happened to Kylie York on the morning or early afternoon of December 2, 2009, will, perhaps, never be known." Commonwealth's Brief at 7. However, the Commonwealth contends that sufficient evidence of Appellant's causation of Kylie's injuries was established because Appellant was the only person with Kylie at the time she sustained her injuries, and because those injuries were simply inconsistent with anything that Kylie could have realistically inflicted upon herself. The Commonwealth argues that malice could be inferred from these circumstances because of the severity of the injuries being inconsistent with any accidental behavior on Appellant's part, as well as the fact that he did not seek medical help once encountering obvious signs of a serious, life-

threatening injury. The trial court adopted similar reasoning in its Rule 1925(a) opinion.

There was sufficient evidence that Kylie's fatal wounds were caused by Appellant. We can reject any notion that the jury accepted Appellant's version of events, or any portion thereof, as our standard of review dictates that we "view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." *Widmer*, 744 A.2d at 751. Furthermore:

> In this jurisdiction we have held that where an adult is given sole custody of a child of tender years for a period of time, and, during that time the child sustains injuries which may have been caused by a criminal agency, the finder of fact may examine any explanation offered and, if they find that explanation to be wanting, they may reject it and find the person having custody of the child responsible for the wounds.

*Commonwealth v. Meredith*, 416 A.2d 481, 482-83 (Pa. 1980).

Here, the evidence demonstrated that Kylie's injuries were so severe that she would not have been able to function at a level described by her mother and other witnesses just prior to the time when Appellant was left alone with her. Thus, the jury could have reasonably concluded that Kylie's injuries could only have been caused by Appellant during that time. As was the case in *Meredith*, "the jury was clearly justified in rejecting the possibility of accidental or self-inflicted injury and finding that [the] appellant was the person who administered the blows that resulted in this tragic death." *Id.* at 483.

There was also sufficient proof that Appellant acted with malice when he caused Kylie's injuries. Kylie suffered multiple blunt force trauma injuries to the head, resulting in a type of brain bruise that is only seen after the application of a significant amount of force. She also sustained severe damage to her neck, including both a rotational injury and compression fractures. In **Commonwealth v. Matthews**, 389 A.2d 71 (Pa. 1978), our Supreme Court indicated that a "full-grown adult who repeatedly used excessive force upon a child of … tender years evidenced an extreme indifference to the value of human life." **Id.** at 73.

Moreover, even if the jury concluded that the injuries to Kylie were not intentionally inflicted by Appellant, the jury could still have found that he acted with malice. Malice can be found where there is evidence of "recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." **Santos**, 876 A.2d at 363. Malice "may be inferred and found from the attending circumstances[.]" **Commonwealth v. Young**, 431 A.2d 230, 232 (Pa. 1981). The severity of Kylie's brain injuries was such that she would not have been able to function normally within minutes, if not seconds, of sustaining them. Dr. Land indicated that, after Kylie sustained her injuries, Appellant would have likely encountered at least some of the following symptoms:

> Often times the children develop agonal respirations, inappropriate breathing patterns. They're unable to breathe properly. They're unable to handle their secretions, because

they're swallowing mechanisms may be interfered with. They can develop seizure activity, posturing, twisting of the limbs, their eyes can roll up into their head. *They do not look normal at that point. They look damaged.*

N.T., 9/28/11, at 57 (emphasis added).

Despite this, Appellant made no effort to seek assistance for Kylie. He did not call for an ambulance or attempt to take her to an emergency room located only two minutes away. Instead, he left her on the couch to be discovered by her mother when she returned from work. From these circumstances, the jury could have inferred that Appellant acted recklessly with regard to the consequences of his inaction, and that he abdicated or was oblivious of a social duty. Accordingly, we conclude that Appellant's sufficiency claim lacks merit.

Judgment of sentence *affirmed*.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/18/2014