J-A20037-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRITTANY WHITE | : | |
| | : | |
| Appellant | : | No. 1535 EDA 2020 |

Appeal from the Judgment of Sentence Entered February 19, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0001999-2019

BEFORE:  STABILE, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED SEPTEMBER 08, 2022**

Brittany White (White) appeals from the judgment of sentence imposed in the Court of Common Pleas of Philadelphia County (trial court) after her waiver trial conviction of aggravated assault (F1), endangering the welfare of a child (EWOC) (F1 and F2), recklessly endangering another person (REAP) (M2) and simple assault (M2).[1]  She challenges the denial of a motion *in limine*, the sufficiency of the evidence where her expert offered a viable alternative explanation, the sufficiency of the evidence to support EWOC as a first-degree felony, and the legality of her sentence where the EWOC counts should have merged and she was not provided a pre-sentence hearing on

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2702(a), 4304(a)(1), 2705 and 2701(a), respectively.

ability to pay costs. We vacate the judgment of sentence for second-degree felony EWOC and affirm in all other respects.

We take the following factual background and procedural history from the trial court's October 7, 2021 opinion and our independent review of the record.

**I.**

On March 29, 2019, the Commonwealth filed an Information against White charging her with the above crimes related to injuries suffered by her sixteen-month-old stepdaughter (Child). The court held a one-day non-jury trial on December 6, 2019. Prior to trial, White filed a motion *in limine* seeking to preclude the Commonwealth's expert, Dr. Norrell Atkinson, from testifying in terms of a "reasonable degree of scientific certainty" which the court denied. The following evidence was adduced at trial.

**A.**

White was the primary caretaker of Child because Child's father worked as a truck driver. (*See* N.T. Trial, 12/06/21, at 34-35). Child "didn't go to daycare" and "was always home wit[h] her[.]" (*See id.* at 119). On the date of the incident, White was home with Child and her other children. (*See id.* at 106). The three older children were upstairs in their bedrooms, and Child and a younger five-month-old baby were downstairs with White. According to White, she left Child alone on the stairs where she allegedly did therapy with her to increase her motor function and went into the adjoining kitchen to put

a baby bottle in the sink. (*See id.* at 106-07, 122-23). She stated that, within a minute, she heard a series of thumps and a "pop" and rushed back into the living room where she found Child laying at the bottom of the stairs attempting to sit up. (*See id.* at 107, 124). When she picked up Child, her leg was "dangling." (*See id.* at 109). She claimed that Child must have fallen down approximately three to five stairs and that Child did not cry as a result, testimony the court found incredible and unbelievable. (*See id.* at 108-09); (Trial Court Opinion, 10/07/21, at 2) (pagination provided). Upon finding Child, she placed her on the couch to eat cereal, called Child's father and they took Child to Einstein Medical Center. (*See* N.T. Trial, at 109-10, 126). The time lapse between the fall and Child's presentation at the emergency room was approximately fifteen minutes. (*See id.* at 127-28).

Child also had bruising to her eye, which White maintained was caused by a fall on an ottoman. (*See id.* at 30). She also claimed that Child caused severe scratches on her neck by scratching her eczema that required White to change the bloody sheets, which the trial court did not believe. (*See id.* at 112, 190-91) ("[I]f you are trying to tell me that in the middle of the night, this young girl, 15 months old, is scratching herself so furiously to the point where she was bleeding and you have to change the sheet and you never heard a word … I can't believe that."). Hospital staff suspected child abuse and consulted Dr. Atkinson, a child abuse specialist as St. Christopher's Hospital. (*See id.* at 23-24).

**B.**

Dr. Atkinson testified as the Commonwealth's expert witness. Dr. Atkinson specializes in child abuse pediatrics, has evaluated hundreds of cases involving child injuries, authored articles on pediatric injuries from falling and taught same. (*See id.* at 13-15). She has been board certified in pediatrics since 2011 and child abuse pediatrics since 2015.

She explained that Child presented at Einstein Medical Center with fractures to her right femur, lower left tibia and lower right tibia. (*See id.* at 22-23). Although the doctor was not able to give the precise age of the fractures, she opined they were about a few days old. (*See id.* at 42). Child also had bruising to her left eye, a scar on her right eye, various scarring and marks on her extremities, a torn frenulum (tissue connecting lip and gum) and, after x-rays and skeletal survey, a fracture to her left forearm was discovered. (*See id.* at 23-24, 26, 30).

Dr. Atkinson recounted how, when she asked White how Child was injured, White said:

> [S]he had been home with [Child] on November the 8th. Dad was at work. She was home with [Child] as well as her siblings. She had placed [Child] on the stairs for—she had reported she did kind of therapeutic exercises with her on the stairs and so had put her on the stairs to crawl. She reported that she briefly went into the kitchen to get a bottle for the younger baby, and while in the kitchen, heard a tumbling and then came to find [Child] at the bottom of the steps. She had heard a pop. [Child] was—started sitting or trying to sit up as she came in, and when she picked her up, she noticed her right leg was hanging.

(*See id.* at 28-29). White also told Dr. Atkinson that Child's scar on her right eye was due to a fall on an ottoman and that she was not certain what caused the left eye bruise or the frenulum tear. (*See id.* at 30).

Dr. Atkinson opined that the scarring under Child's chin/on the neck were consistent with a pattern of injuries caused by the fingernails of another person. (*See id.* at 31-32). These areas were white in color and the top layer of skin was removed, which could not have been done by Child simply scratching eczema, as White had alleged. She stated that they and her torn frenulum were healing at the time of Child's hospital admission. (*See id.* at 42).

The doctor testified that Child's multiple fractures could not have been caused by the type of fall claimed by White because there was not enough force, specifically stating that the four fractures were "way more injury than should be expected in the setting of a short fall." (*See id.* at 38-40). She explained that the different forces necessary to cause the diverse types of breaks on various parts of Child's body could not be generated by a fall down three to five steps. (*See id.* at 44-45). Although she was not able to identify the precise age of the fractures, the doctor opined that they had occurred within the last few days. (*See id.* at 42). She rejected White's claim that Child injured her eye by falling on an ottoman. (*See id.* at 43).

Child also had delayed motor functions, being unable to walk without support at sixteen months of age, and her weight was below the third

percentile, classifying her as failure to thrive. (**See id.** at 26-27). Based on Dr. Atkinson's review of Child's medical history, there was nothing that would have predisposed her to any of the injuries. (**See id.** at 31).

When Dr. Atkinson saw Child for a follow-up visit after she had been in foster care for approximately three weeks, "the bruise was gone. Her mouth was healed and [it] looked as though there were no new injuries on exam." (**See id.** at 47). Dr. Atkinson affirmed that all opinions and testimony were given to a reasonable degree of medical certainty. (**See id.** at 56). The trial court "found Dr. Atkinson's testimony to be credible, authoritative and accepted same as true." (Trial Ct. Op., at 2) (pagination provided).

## C.

Raquel Vraakm, a child abuse investigator from the Department of Human Services (DHS), met with Child, White, Child's father, her paternal grandmother and hospital staff on November 9, 2018. (**See** N.T. Trial, at 84). White's story to her about what had happened to Child was mostly consistent with what she told Dr. Atkinson, although Ms. Vraakm testified that White had told hospital staff at Einstein Medical Center "that [Child] was crawling around screaming in the home and must have gotten up the stairs and fell down." (**See id.** at 87).

Ms. Vraakm described White's interactions with Child as "awkward" and noted that "[t]he terms or verbiage she used to console [C]hild was not of normal bonding that we typically see with mother/child, stepmother and

child." (*See id.* at 88). Although White did not seem to express concern for Child, her interaction with her biological children was notably different, with her "being all, kissing, cooing, stuff like that to the [other] child that was present at the hospital." (*See id.* at 89).

The day after the interview, Ms. Vraakm removed Child from her parents' custody and placed her in foster care. (*See id.* at 90). She saw notable changes in Child when she saw her three weeks later. "She was much more interactive. She was feeding herself. She was sitting in a highchair. She was interacting with the foster parent. She was making … sounds at me." (*See id.* at 91). Child also appeared physically bigger and her skin had completely cleared.

## D.

Biomechanical engineer Kurt Laurence Thibault testified as an expert on behalf of White. His research background and Ph.D. were in researching and studying how the human body develops and affects the overall response to impact. (*See id.* at 136-45). He studied "how immature head and tissues become suited on the skull," "the function of age in development" and "how those properties affect the overall response to impact." (*See id.* at 140-41). Mr. Thibault used child crash test dummies to measure how the forces of impact correlated with skull fractures. (*See id.* at 154-56). He opined that Dr. Atkinson's opinions were flawed because they are not based on science, and that Child's fall could have caused her injuries. (*See id.* at 156-60). He

hypothesized that because an individual could simultaneously fall to her hands and knees, while hitting "anything in those load paths," Child could also theoretically suffer the various fractures at the same time. (*See id.* at 158). He stated that the force generated by Child's fall could generate and dissipate in the same manner as a car going from being in motion to a full stop, and that "a single fall does not mean there could not be multiple injuries. For a single car accident you can have multiple injuries." (In other words, the human body, upon full stop, would first put pressure on its contact point at the point of impact, and then the mass of the body would continue to travel for a brief time, resulting in the fractures. (*See id.*).

Accepting Dr. Atkinson's testimony over the testimony of Mr. Thibault, the trial court convicted White of all charges, imposing a term of not less than four nor more than eight years' incarceration on the charge of aggravated assault and a consecutive term of five years' probation on the first-degree EWOC conviction, plus mandatory court costs in the amount of $757.57. (*See* Guilty Sentencing Order, 2/19/20, at 1-2). It did not impose any further penalty on the charges of second-degree EWOC, simple assault or REAP. White timely filed a notice of appeal and a statement of errors complaint of on appeal pursuant to the trial court's order. *See* Pa.R.A.P. 1925(b).

She raises five questions for our review: (1) whether the trial court erred in denying her motion *in limine* to preclude Dr. Atkinson from using the phrase, "a reasonable degree of scientific certainty;" (2) whether the evidence

was insufficient to sustain her conviction where the Commonwealth did not establish that Child's injuries were the result of knowing, intentional or reckless conduct since Mr. Thibault refuted Dr. Atkinson's testimony; (3) whether the evidence was insufficient to establish first-degree EWOC where it did not prove that White knowingly engaged in a course of conduct that endangered Child's welfare; (4) whether the court imposed an illegal sentence by failing to merge the two counts of EWOC; and (5) whether the court imposed an illegal sentence when it failed to conduct an ability to pay hearing to determine if White could pay for court costs and probation supervision. (*See* White's Brief, at 5-6).

## II.

## A.

White first argues that the trial court erred in denying her motion *in limine* and allowing Dr. Atkinson to use the phrase, "a reasonable degree of medical certainty." (*See id.* at 24).[2] She maintains that the phrase is irrelevant and prejudicial because it can mislead the court into believing a conclusion based on use of that language alone. In support of her position, she provides an extensive history of the term, a statement from the National

---

[2] [W]hen reviewing the denial of a motion *in limine,* "we apply an evidentiary abuse of discretion standard of review. Thus, we review the denial of the motion for an abuse of discretion." ***Commonwealth v. Hitcho***, 123 A.3d 731, 747 (Pa. 2015) (citations and internal quotation marks omitted).

Commission on Forensic Science that the standard lacks scientific meaning and guidance from the Department of Justice that its experts refrain from using the phrase. (**See id.** at 24-34). The Commonwealth responds that these guidelines are not binding and are contrary to Pennsylvania law, which requires medical experts to testify to a reasonable degree of medical certainty.[3] (**See** Commonwealth's Brief, at 15).

"A motion *in limine* is used before trial to obtain a ruling on the admissibility of evidence. It gives the trial judge the opportunity to weigh potentially prejudicial and harmful evidence before the trial occurs, thus preventing the evidence from ever reaching the jury." **Commonwealth v. Reese**, 31 A.3d 708, 715 (Pa. Super. 2011) (citation omitted).

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

---

[3] At oral argument, White's counsel conceded that the standard for an expert's testimony is a reasonable degree of medical certainly, but was raising the issue to preserve it for further review by our Supreme Court. White also complains in her sufficiency argument that Dr. Atkinson's opinion was "not beyond a reasonable doubt." (**See** White's Brief, at 40). "Beyond a reasonable doubt" is the factfinder's standard in determining whether the Commonwealth met its burden.

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702; *see id.* at Comment ("Pa.R.E. 702 does not change the requirement that an expert's opinion must be expressed with reasonable certainty.").

It is well-settled that in Pennsylvania, "our Supreme Court has emphasized [that an] expert must base the substance of her opinion on a reasonable degree of certainty instead of mere speculation." **Commonwealth v. Gonzalez**, 109 A.3d 711, 727 (Pa. Super. 2015), *appeal denied*, 125 A.3d 1198 (Pa. 2015) (citation omitted); **see also Commonwealth v. Spotz**, 756 A.2d 1139, 1150 (Pa. 2000), *cert. denied*, 532 U.S. 932 (2001) ("forensic pathologist's testimony in first-degree murder trial as to victim's manner of death was properly based on reasonable degree of medical certainty[.]").

Here, the trial court explains that it denied White's motion *in limine* because it:

> found that the Commonwealth's expert witness's background was both relevant and applicable to the instance at hand. It was neither irrelevant nor highly prejudicial. The expert witness's background and work history provided a substantial basis for the testimony that he produced at trial. This background allowed the expert witness to produce testimony that was based in personal knowledge of infant injuries to show what can cause these types of injuries and it provided insight in showing that the scenario presented by the defense could not have produced the injuries that were presented in the ER. …

(Trial Ct. Op., at 15). We discern no abuse of discretion in the trial court's decision denying White's motion *in limine*.

It was within the court's discretion whether to allow Dr. Atkinson to state that she reached her conclusions within a reasonable degree of professional certainty or if this would be too prejudicial to White in this non-jury trial. **See Reese**, **supra** at 715. Dr. Atkinson has the knowledge beyond that possessed by a layperson that would help the court to understand the evidence or determine a fact at issue and her methodology was generally accepted by professionals in her field. **See** Pa.R.E. 702. Using the language, "beyond a professional certainty," while not a "methodology," has been long-accepted and indeed required language in a legal proceeding in Pennsylvania, and White failed to provide any binding precedent dictating that the court reach a decision precluding this language because it is too prejudicial as a matter of law. White's first issue lacks merit.

**B.**

In her second issue, White claims that the evidence was insufficient to convict her of any charges because it does not establish criminal intent since it was equally as consistent with innocence as it was of guilt.[4] (**See** White's

---

[4] Our standard of review of this issue is well-settled:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most

*(Footnote Continued Next Page)*

Brief, at 37-41). Relying on *In re J.B.*, 189 A.3d 390 (Pa. 2018), her argument is that because "the evidence supporting the inference of [her] guilt is in equipoise with the evidence supporting the conclusion that [she] did not commit the offense, the Commonwealth fails to meet its requisite burden of establishing guilt beyond a reasonable doubt." (*Id.* at 41). She maintains that the trial court's conclusion that Child's injuries were caused by child abuse was "the product of surmise or conjecture" where Mr. Thibault offered unrebutted biomechanical engineer testimony to the contrary and, therefore, the Commonwealth did not prove guilt beyond a reasonable doubt. (*Id.*); (*see id.* at 39).

_____

favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Sebolka*, 205 A.3d 329, 336-37 (Pa. Super. 2019) (citation omitted). "Importantly, the [fact-finder], which passes upon the weight and credibility of each witness's testimony, is free to believe all, part, or none of the evidence." (*See id.* at 337) (citation omitted).

- 13 -

In **J.B**., our Supreme Court held that despite the deferential standard of review we set forth above in footnote 4, there is an exception where "the entire body of evidence introduced at trial which furnished the basis for an appellant's conviction is so deficient that it does not reasonably support a finding of guilt beyond a reasonable doubt, as a matter of law." **J.B.**, 189 A.3d at 409 (citation omitted). In other words, there may be cases where "the trial evidence equally supported two reasonable but diametrically opposed ultimate inferences: one that the defendant committed the murder, and the second that he did not commit the murder." **Id.** "[I]n those atypical situations, our Court has consistently held that we are not bound by the factual findings and credibility determinations rendered by the finder of fact, and we are compelled in such circumstances to reverse a legally erroneous conviction." **Id.** (citation omitted).

In making her argument, White contends that the evidence is in equipoise because the two experts reviewed the same evidence and came to diametrically opposed conclusions—the Commonwealth's expert saying that the Child's injuries were a result of an intentional act committed by her while her expert witness testified that Child's injuries were the result of a fall. What that argument ignores is that the trial court accepted Dr. Atkinson's testimony as the Commonwealth's expert, but rejected the testimony of White's expert, Mr. Thibault, because he could not credibly testify to the cause of the injuries

where he was not a medical doctor and did not work with children. (*See* White's Brief, at 38-41).

The trial court found Dr. Atkinson's testimony to be "credible, authoritative and [it] accepted the same as true," while finding the testimony of White's expert, Mr. Thibault, lacked credibility and weight because he based his opinion on prior studies that he read and the use of car injury crash test dummies. (Trial Ct. Op., at 2); (*see id.* at 4). While White argues that this was error and asks that we re-weigh the evidence because Mr. Thibault provided "unrebutted biomechanical engineer testimony," we decline to do so.

Dr. Atkinson is a licensed child abuse pediatrician with years of experience and training, who has testified in multiple cases, treated Child and penned a paper on the effect of falls on pediatric patients. Mr. Thibault is a biomechanical engineer who had no training or experience on the issue presented here: whether an alleged fall from three to five stairs, scratching of eczema and falling on an ottoman could cause the types of severe injuries presented by the underweight, underdeveloped non-thriving child. It was within the trial court's province as factfinder to believe all, some or none of the evidence and determine the credibility of witnesses and the weight to be afforded their testimony. *See Sebolka*, *supra* at 336-37.

Additionally, "[a]n argument that the finder of fact should have credited one witness' testimony over that of another witness goes to the weight of the evidence, not the sufficiency of the evidence." *See Commonwealth v.*

***Gibbs***, 981 A.2d 274, 281-82 (Pa. Super. 2009), *appeal denied*, 3 A.3d 670 (Pa. 2010) (citations omitted).

Accordingly, her claim that the evidence was insufficient to establish that she abused Child resulting in Child's injuries because it just as likely proved her innocence lacks merit.

**1.**

As to her argument that the evidence was insufficient because intent was not proven, "[i]ntent can be proven by direct or circumstantial evidence; it may be inferred from acts or conduct or from attendant circumstances." ***Commonwealth v. Lewis***, 911 A.2d 558, 564 (Pa. Super. 2006). It is long-settled that where there are "no eyewitnesses to the alleged beating … the Commonwealth need not prove its case directly. Circumstantial evidence can be as reliable and persuasive as eyewitness testimony." ***Commonwealth v. Blevins***, 309 A.2d 421, 486 (Pa. 1973) (citation omitted). Importantly:

> [W]here an adult is given sole legal custody of a child of tender years for a period of time, and, during that time the child sustains injuries which may have been caused by a criminal agency, the finder of fact may examine any explanation offered and … reject it and find the person having custody of the child responsible for the wounds.

***Commonwealth v. Meredith***, 416 A.2d 481, 482-83 (Pa. 1980) (citations omitted). A defendant's fabrication of the cause of a child's injuries is compelling evidence that she caused them. ***See Commonwealth v. Hoffman***, 198 A.3d 1112, 1120 (Pa. Super. 2018) (where mother rolled off couch and onto child while under the influence of substances and then gave

conflicting stories about surrounding facts, "[t]he jury was free to conclude that [her] statements to police displayed consciousness of guilt.").

In this case, the trial court found that the evidence was sufficient because it established that Child was put in a dangerous situation in which she sustained serious injuries that "could not have resulted without the absence of knowing intentional and reckless behavior on the part of [White]." (Trial Ct. Op., at 9); (*see id.* at 9-13). The record supports the court's conclusion.

Although there was no eyewitness testimony about the cause of Child's injuries other than that of White, White was her primary caretaker and the injuries occurred while in White's care. Dr. Atkinson dismissed her explanations for the injuries as implausible. The doctor specializes in child abuse pediatrics, has evaluated hundreds of cases involving child injuries, authored an article on pediatric injuries from falling and is also a professor teaching same. (*See id.* at 13-14). She has been board certified in pediatrics since 2011 and child abuse pediatrics since 2015. (*See id.*).

She explained that Child presented at Einstein Medical Center with fractures to her left forearm, right femur, left tibia and right tibia, bruising to her eye, various dark markings on her extremities and a torn frenulum. (*See id.* at 22-23). She had delayed motor functions, being unable to walk without support at sixteen months of age, and her weight was below the third percentile, classifying her as failure to thrive. (*See id.* at 26-27). She

testified that based on her review, there was nothing in Child's medical history that would have predisposed her to any of the injuries. (*See id.* at 31).

Dr. Atkinson credibly opined that the scarring under Child's chin/on the neck were consistent with a pattern of injuries caused by fingernails and that extent of the skin injury would not have been caused by Child as alleged by White. (*See id.* at 31-32). She testified that Child's multiple fractures were "way more injury than should be expected in the setting of a short fall" because the different forces necessary to cause the different types of breaks on various parts of Child's body could not be generated by a fall down five steps. (*See id.* at 39, 44-45). While she could not identify the precise age of the fractures, she testified that they were, at most, "a few days old." (*See id.* at 42). She rejected White's claim that Child injured her eye by falling on an ottoman. (*See id.* at 43).

The circumstantial evidence and expert testimony of Dr. Atkinson presented by the Commonwealth were sufficient to establish that White had the reckless and knowing intent to, and did, cause serious bodily injury to Child. (*See id.* at 481) (affirming father's murder conviction where he was in exclusive custody of child, whom he claimed sustained his injuries in fall from tricycle, but experts concluded that "the injuries causing death were inconsistent with a fall, particularly a fall as described by appellant."); *see also Blevins*, *supra* at 421 (affirming mother's murder conviction where she claimed child's death was caused by his fall down steps, but his autopsy

revealed 39 bruises on his upper body, a hemorrhaged liver and damaged kidneys and doctor testified it was "very unlikely" that these injuries were caused by a fall down steps).

Accordingly, the evidence is sufficient to establish the requisite intent to cause the injuries.[5]

## C.

White next maintains that the evidence was insufficient to support her conviction of first-degree EWOC. (*See* White's Brief, at 42). She argues that because this statute requires that an offender engage in a course of conduct, and "there was no evidence that Child was the victim of a course of conduct that repeatedly placed her at a risk of serious bodily injury, Count 2 was improperly graded as a felony of the first degree at sentencing." (*See id.* at 43).

First-degree felony EWOC requires that the person who endangers the welfare of a child, "created a substantial risk of death or serious bodily and was part of a course of conduct." 18 Pa.C.S. § 4304(a)(1), (b)(iv), (b)(2). For first-degree EWOC, "[t]he Commonwealth must allege in the information

---

[5] Neither do we find the cases noted but not discussed by White to be persuasive. (*See* White's Brief, at 41, n.88-n.90). None of the cases involved competing expert opinions in situations involving potential child abuse or the legal principle that, because Child suffered injuries that may have been caused by a criminal act, during a time when White had sole legal custody of her, the trial court could examine and reject any explanation offered. *See Meredith*, *supra* at 482-83.

and present evidence at trial of … 'course of conduct' ... [that] is not an element of the offense of endangering the welfare of a child, but it is an additional fact, [for the fact-finder], that impacts the grading of the offense. ***Commonwealth v. Popow***, 844 A.2d 13, 18 (Pa. Super. 2004). The elevated grading is designed to punish a parent who over days, weeks, or months, abuses his children[.]" (***See id.*** at 17).

In this case, the Commonwealth argued and presented evidence to support a finding that there was a course of conduct of child abuse. In addition to the fractures, Child had a bruised and scarred right eye, a torn frenulum and scarring on her neck that Dr. Atkinson said were healing at the time she presented at the hospital with the fractures. (***See*** N.T. Trial, at 42). She was severely underdeveloped and failing to thrive, being in the third percentile for weight and at least four months behind in walking. (***See id.*** at 26-27).

The evidence established that White was the primary caretaker of Child since father worked outside the home as a truck driver. (***See id.*** at 34-35). White admitted that Child did not go to daycare and was always at home with her. (***See id.*** at 119). She offered implausible excuses for Child's eye injury, claiming it was caused by a fall on an ottoman, and for the scarring on her neck as being caused by Child scratching. (***See id.*** at 30). Dr. Atkinson testified that these claims were impossible, as the ottoman could not have caused the eye injury, which only could have been caused by a "protruding object," and the scratches were "very distinct markings to her neck" that were

"not consistent with something that a child would do to themselves." (**See id.** at 32, 43). The trial court agreed, stating, "if you are trying to tell me that in the middle of the night, this young girl, 15 months old, is scratching herself furiously to the point where she was bleeding and you have to change the sheet and you never hear a word … I can't believe that." (**See id.** at 190-91).

In fact, Ms. Vraakm testified that once Child was no longer in White's care, she visibly improved after three weeks with her foster parents. "She was much more interactive. She was feeding herself. She was sitting in a highchair. She was interacting with the foster parent. She was making … sounds at me." (**See id.** at 91). Child also appeared bigger physically and her skin was clear, findings that Dr. Atkinson confirmed, stating that when she followed up with her after she had been in foster care, "the bruise was gone. Her mouth was healed, and she looked as though there were no new injuries on exam." (**See Id.** at 47).

Based on the foregoing, the evidence established that Child's injuries occurred over "days, weeks, or months" while she was in White's primary care. **Popow**, **supra** at 17. Hence, the evidence was sufficient to establish that there was a course of conduct supporting EWOC as a first-degree felony. **See Sebolka**, **supra** at 336-337. White's third issue lacks merit.

**D.**

In her fourth issue, White argues that the court imposed an illegal sentence by imposing two separate sentences on the two EWOC counts.[6] (**See** White's Brief, at 43-45). She maintains that entering a sentence of "no further penalty" on the second-degree felony EWOC conviction was illegal where there was only one child and no separate incident of child abuse alleged. (**See id.**). The Commonwealth agrees but contends that remand is unnecessary since it did not affect the sentencing scheme. (**See** Commonwealth's Brief, at 28-29).

It is well-settled that crimes merge for sentencing purposes where they "arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense." **Hoffman**, **supra** at 1121 (citing 42 Pa.C.S. § 9765).

The two counts of EWOC were based on the same criminal act and involved the same statutory elements, as the "course of conduct" language is for grading purposes only. Hence, we vacate the sentence for second-degree felony EWOC. However, as noted by the Commonwealth, this does not affect

---

[6] "The determination as to whether a trial court imposed an illegal sentence is a question of law; an appellate court's standard of review in cases dealing with questions of law is plenary." **Commonwealth v. White**, 268 A.3d 499, 500 (Pa. Super. 2022) (citation omitted).

the sentencing scheme and, therefore, we decline to remand for re-sentencing. *See Commonwealth v. Thur*, 906 A.2d 552, 569 (Pa. Super. 2006), *appeal denied*, 946 A.2d 687 (Pa. 2008) (noting, "if our decision does not alter the overall scheme, there is no need for remand.").

**E.**

In her fifth and final issue, White argues that pursuant to Rule 706(C) of the Pennsylvania Rules of Criminal Procedure,[7] she was entitled to a

_____

[7] Rule 706 provides:

> (A) A court shall not commit the defendant to prison for failure to pay a fine or costs unless it appears after hearing that the defendant is financially able to pay the fine or costs.

> (B) When the court determines, after hearing, that the defendant is without the financial means to pay the fine or costs immediately or in a single remittance, the court may provide for payment of the fines or costs in such installments and over such period of time as it deems to be just and practicable, taking into account the financial resources of the defendant and the nature of the burden its payments will impose, as set forth in paragraph (D) below.

> (C) The court, in determining the amount and method of payment of a fine or costs shall, insofar as is just and practicable, consider the burden upon the defendant by reason of the defendant's financial means, including the defendant's ability to make restitution or reparations.

> (D) In cases in which the court has ordered payment of a fine or costs in installments, the defendant may request a rehearing on the payment schedule when the defendant is in default of a payment or when the defendant advises the court that such default is imminent. At such hearing, the burden shall be on the defendant to prove that his or her financial condition has deteriorated to the extent that the defendant is without the means

*(Footnote Continued Next Page)*

determination at sentencing of whether court costs and/or fines should be reduced due to her financial means and inability to pay.[8] (**See** White's Brief, at 45-47). The Commonwealth agrees with White.

Recently, while this case was pending on appeal, the Pennsylvania Supreme Court considered this precise issue. **See Commonwealth v. Lopez**, ___ A.3d ___, 2022 WL 3363051, at *1, *3 (Pa. filed Aug. 16, 2022). The Court conducted an exhaustive review and concluded, "it is apparent from multiple decisions by this Court and the Superior Court, as well as the plain language of the rule, its comment, and statutes *in pari materia*, that Rule 706(C) does not require consideration of the defendant's ability to pay prior to the imposition of mandatory court costs at sentencing." (**See id.** at *9). It explained, in pertinent part:

> Importantly, Rule 706(C) does not exist in isolation. It is the third section of a four-section rule. The rule's three other sections clearly refer to post-sentencing proceedings after the court has already ordered costs at sentencing. Specifically, Section (A) requires the court to conduct an ability-to-pay hearing

_____

> to meet the payment schedule. Thereupon the court may extend or accelerate the payment schedule or leave it unaltered, as the court finds to be just and practicable under the circumstances of record. When there has been default and the court finds the defendant is not indigent, the court may impose imprisonment as provided by law for nonpayment.

Pa.R.Crim.P. 706.

[8] "The interpretation of the Rules of Criminal Procedure presents a question of law and therefore … our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Dowling**, 959 A.2d 910, 913 (Pa. 2008) (citation omitted).

prior to imprisoning a defendant for failing to pay costs already imposed, Section (B) permits the court to order previously imposed costs to be paid in installments, and Section (D) allows for a rehearing if a defendant is in imminent or actual default on such installment payments. … Further, the language of Section (A) gives no indication this provision involves anything other than an initial inquiry into the defendant's ability to pay. Section (A) does not refer in any way to a previous determination of ability to pay under Section (C). In this regard, Section (A) stands in clear contrast to Section (D), which explicitly refers to a "rehearing" on the defendant's ability to pay. Viewed, as it must be, in the context of the other sections of Rule 706, it is apparent Rule 706(C), like the rest of the rule, pertains to post-sentencing proceedings and appears in chronological order. That is, **Rule 706(C) concerns the court's post-sentence determination** of the amount and method of payment **after the defendant has defaulted** and the court has found, following a hearing, that the defendant is without the financial means to pay.

(**See id.**); (emphases provided).

The Court noted that the comment to the Rule supports this interpretation because it reflects that the purpose of Rule 706 was to enact the holding of **Commonwealth v. Benedict**, 304 A.2d 158 (Pa. 1973), "namely, to require an ability-to-pay hearing prior to imprisonment for failure to pay a fine or costs and permit installment payments upon a showing of demonstrated need." **Lopez**, **supra** at *6. Further, the Court observed that "interpreting Rule 706(C) to require a presentence ability-to-pay inquiry would place the rule directly at odds with [42 Pa.C.S. §§] 9721(c.1) and 9728(b.2)," which "do not require the court to consider the defendant's ability to pay prior to the imposition of costs. Indeed, the statutes do not require any court involvement whatsoever before costs are imposed." (**See id.** at *7). It also considered precedent, including this Court's holdings in **Commonwealth v.**

***Childs***, 63 A.3d 323, 326 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013), and ***Commonwealth v. Hernandez***, 917 A.2d 332 (Pa. Super. 2007). (***See id.*** at *9).

After its exhaustive review, the Supreme Court expressly held that "Rule 706(C) does not require a trial court to consider a defendant's ability to pay prior to imposing mandatory court costs at sentencing." ***Lopez***, ***supra*** at *9, *15. Therefore, the trial court did not err in not holding an ability-to-pay hearing before sentencing White. White's final issue lacks merit.

Judgment of sentence vacated in part. Affirmed in all other respects. Jurisdiction relinquished.

*Judgment Entered.*

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>9/8/2022</u>